[Crim. No. 4735. Fifth Dist. Aug. 5, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL CLAUD SUTTER, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Julia Cline Newcomb, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Willard F. Jones and Jane Kirkland Fischer, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CONKLIN, J.*—**Appellant, Michael Claud Sutter, and Archie Mayhew (not a party to this appeal) were charged with violation of Penal Code section 211, robbery. There were special allegations that Mayhew used a firearm (Pen. Code, § 12022.5) and that appellant was armed as a principal (Pen. Code, § 12022 subd. (a)).

Thereafter, the court accepted defendant Mayhew's guilty plea to robbery in count I (Pen. Code, § 211) without any special allegations. Mayhew had not been sentenced at the time of appellant's trial.

Appellant was convicted of robbery and the jury made a true finding that he was a principal in the robbery while another principal was armed with a firearm. The trial court then denied appellant's motion for a new trial because of juror misconduct and sentenced him to state prison for three years, which was the middle term for the robbery, plus an additional year for a violation of Penal Code section 12022, subdivision (a).

### FACTS

On the afternoon of August 9, 1979, appellant Michael Sutter and Archie Mayhew were drinking and playing pool at a bar in Visalia. There was evidence they were probably drunk. Later, appellant and Mayhew went to Galen's Market. Appellant parked his car in the parking lot. The passenger door was open and the engine was running.[1]

Mayhew took a six-pack of beer to the clerk; when she told him the price, he said he did not have the money and she could take it out of the

---

*Assigned by the Chairperson of the Judicial Council.

[1]The store clerk who was robbed noticed that, before Mayhew walked in, a car had pulled up in front of the store, backed out and the engine was left running.

cash register. She replied there was not much there and he told her to take it out and give it to him. He also told her he was not joking around and he had just gotten out of Soledad; he said, "I don't want to pull a piece on you, give me the money" and he lifted up his shirt and showed her what the clerk described as a "butt end." She took approximately $105 out of the register and gave it to Mayhew; he put it in his pants pocket and said he was sorry he had to do it but he needed the money. Then he left.

Mayhew came out of the store with a paper sack. He was walking really fast and then running. He then jumped in appellant's car which took off, throwing up gravel as it left.

After being arrested, appellant waived his *Miranda* rights and gave a statement to a Tulare County sheriff's deputy. He said he and Mayhew had been playing pool and drinking beer at the Green Olive Bar when Mayhew suggested that appellant give him a ride to Galen's Market because Mayhew was going to borrow some money from the market owner or the owner owed him some money. Appellant said they went to the market, Mayhew went inside and came out a short time later carrying a sack containing a six-pack of beer and they then left. Appellant also stated he did not know Mayhew was going to rob the market and he was not aware Mayhew had a firearm.

On the passenger side of the front seat of appellant's car sheriff's deputies found a transparent yellowish-colored plastic container containing some unspent 32-caliber cartridges.

Appellant testified he had had trouble starting his car and left the engine running so that he would not have to jump start it again as he had done on three earlier occasions that day. He did not recall the passenger door being open when Mayhew was in the store. He indicated the passenger door did not always close because the car had been wrecked and the door sometimes was ajar. He stated that Mayhew walked out of the store, offered him a beer which he declined, and they then left. He testified his car could not accelerate fast enough to throw up gravel.

Appellant further testified that Mayhew never showed him any money; he did not see Mayhew with any firearm; he had never seen the plastic container of bullets and had no idea how it got into his car.

## I.

Before testimony was taken, the trial court held a hearing to determine if the prospective defense witness, Archie Mayhew, was going to take the Fifth Amendment. Mayhew testified that he was going to assert the privilege.

The People then represented there was another robbery which was committed in the same "time frame," the vehicles had the same descriptions, the descriptions of the participants were the same, and indicated there was a common modus operandi. The deputy district attorney noted that, although the charges had been dismissed, the charge against Mayhew could still be refiled.[2]

Appellant's defense counsel argued that Mayhew should be allowed to testify. He contended the first offense was irrelevant to the second offense and noted how the district attorney had not been interested in the other robbery for nine to ten weeks. Also, he had interviewed Mayhew with regard to the crime to which Mayhew had pled guilty. Defense counsel represented: "It's my belief that he would testify that Mr. Sutter had nothing to do with the alleged offense to which he pled guilty, had no prior knowledge or intent knowledge as to what had occurred inside the store, and that thereafter, he and Mr. Sutter separated company, and Mr. Mayhew was then arrested in the Round Table Pizza, in Visalia. [¶] Mr. Sutter was nowhere around. That's corroborated by the police and other witnesses. It's my belief that the testimony of Mr. Mayhew would not be incriminatory since he has already pled guilty to the offense."

Appellant's defense counsel disputed the similarities of the crimes and also made an offer of proof that Mayhew had talked to the probation department, had admitted to them his involvement in the robbery at Galen's Market,[3] that appellant was outside the store when he com-

---

[2]Mayhew's counsel had previously contended that any answers to questions whether Mayhew had been with appellant on the day in question might incriminate him because evidence of their association would likely lead to further prosecution on the second robbery.

A preliminary hearing had already been held on the second robbery and the charges against appellant Sutter and Mayhew were discharged because of a tainted eyewitness identification.

[3]Defense counsel may have overstated his case. Mayhew told his probation officer that he was drunk and "only remembers joking with the clerk and laughing" and he did

mitted the offense, and appellant had no knowledge as to what Mayhew intended before or even afterward.

The trial court ruled that Mayhew could properly assert his Fifth Amendment privilege stating "[his testimony] would tend to tie him to another similar robbery and be enough to fill in the gaps of the prosecution's case and threaten him with actual prosecution."

Defense counsel then made a motion that the court grant Mayhew immunity with regard to any other offense that occurred on that evening, i.e., the second robbery. Recognizing the request was "unusual" and probably outside the statute as the district attorney usually made the motion, defense counsel argued it would be in the interests of justice and getting the truth out for the court, which would be within its power, to grant Mayhew immunity.

The trial court denied the motion noting that the statute permitting the granting of immunity gives the prosecution sole discretion and does not give the court jurisdiction to initiate those proceedings unless the prosecution requests. The People indicated they would not request immunity and that the second robbery was an open file.

■ Appellant now contends the trial court erred in failing to grant *judicial* (not statutory) use immunity to Mayhew so as to overcome his Fifth Amendment claim. Appellant premises his argument on the Fifth Amendment (due process), the Sixth Amendment (right to compulsory process) and on federal case law which has authorized such immunity.

Respondent contends the request for such immunity was not raised below and has therefore been waived; if use immunity were granted, a heavy burden would be placed upon the prosecution to prove that the evidence of the other robbery was obtained from a wholly independent source; and the government had a continuing interest in prosecuting Mayhew.

Generally, an "objection is sufficient if it fairly apprises the trial court of the issue it is being called upon to decide." (*People* v. *Scott* (1978) 21 Cal.3d 284, 290 [145 Cal.Rptr. 876, 578 P.2d 123]; see also

commit the robbery but he did not remember the robbery (thus impliedly denying scienter), how he did it or whether or not he was armed. The trial court did not, however, have Mayhew's probation report before it when ruling on the request for immunity.

*People* v. *Sipress* (1975) 51 Cal.App.3d 98, 102-103 [123 Cal.Rptr. 884].)

Defense counsel stated that the request was "probably" outside the statute as the motion was usually made by the district attorney, yet he implied there could be a grant of judicial immunity as "the Court would be well within it's [*sic*] power" to grant Mayhew immunity.

Here, defense counsel did not request that the trial court grant Mayhew judicial use immunity nor did defense counsel specify that he was basing his claim on the Fifth and Sixth Amendments. In fact, it appears the trial judge understood defense counsel to be requesting a type of immunity very different from that now being asserted on appeal because the lower court denied the motion on the ground that the statute (Pen. Code, § 1324) gives the prosecution sole discretion. Under settled principles of appellate review a claim of error not made in the trial court is waived.

The discussion of the grant of immunity issue should end here. However, the dissent contends that, notwithstanding state and federal statutory and case law to the contrary, we should declare a·doctrine of judicially declared use immunity based upon constitutional principles. In that context we are compelled to explain why we disagree.

Use immunity protects a witness only against the actual use of his compelled testimony and evidence derived directly or indirectly therefrom, while transactional immunity protects the person against all later prosecutions relating to matters about which he testifies. (Witkin, Cal. Evidence (2d ed. 1982 supp.) § 928, p. 508.)

In *Kastigar* v. *United States* (1972) 406 U.S. 441 [32 L.Ed.2d 212, 92 S.Ct. 1653], the Supreme Court held that a federal statute conferring use immunity was consonant with the Fifth Amendment. The *Kastigar* court also noted that, once a defendant testifies under a grant of use immunity, the prosecution has the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony. (*Id.*, at p. 460 [32 L.Ed.2d at p. 226].)

In California, Penal Code section 1324 permits a transactional immunity order only upon request of the district attorney. (*Daly* v. *Superior Court* (1977) 19 Cal.3d 132, 146 [137 Cal.Rptr. 14, 560 P.2d 1193].)

Moreover, under California case law, the trial court's decision not to grant Mayhew statutory immunity or "state conferred immunity" was proper and did not deny appellant due process, equal protection or a right to a fair trial. (See *People* v. *Pineda* (1973) 30 Cal.App.3d 860, 868 [106 Cal.Rptr. 743]; *People* v. *Traylor* (1972) 23 Cal.App.3d 323, 331-332 [100 Cal.Rptr. 116]; *In re Marshall K.* (1970) 14 Cal.App.3d 94, 99 [92 Cal.Rptr. 39]; and *People* v. *Williams* (1970) 11 Cal.App.3d 1156, 1163-1164 [90 Cal.Rptr. 409].)

■ In *In re Marshall K., supra*, 14 Cal.App.3d 94 (decided by this court), a juvenile defendant contended that he was deprived of a fair trial by the court's ruling that a coparticipant could properly exercise his Fifth Amendment rights when called as a defense witness. (*Id.*, at p. 99.) He argued that a defendant in a criminal action should be entitled to require the state to grant immunity to a witness who has knowledge of the facts of his case to insure him of a fair trial. This court rejected that contention and noted that the "cases hold that the state is under no obligation to make a witness available to testify for a defendant, or on behalf of the People for that matter, by granting him immunity from prosecution." (*Ibid.*)

Although not citing *Marshall K.*, appellant raises a similar argument by asking this court to hold that the trial court erred in failing to grant judicial use immunity under the Fifth and Sixth Amendments.[4]

■ Initially, the district attorney was clearly within his statutory rights by refusing to grant Mayhew immunity as the decision to grant immunity is solely within his discretion. (*People* v. *Pineda, supra*, 30 Cal.App.3d 860, 868; see also *In re Weber* (1974) 11 Cal.3d 703, 720 [114 Cal.Rptr. 429, 523 P.2d 229].)

■ While there is California precedent for a limited judicially declared use immunity (see *Daly* v. *Superior Court, supra*, 19 Cal.3d 132, 146; *People* v. *Coleman* (1975) 13 Cal.3d 867, 889-892 [120 Cal.Rptr. 384, 533 P.2d 1024]; *Tarantino* v. *Superior Court* (1975) 48 Cal.App. 3d 465, 470 [122 Cal.Rptr. 61]), all of those cases involve radically dif-

---

[4]While the argument here is for use immunity, the issue was not clearly stated to the trial court. In addition to failing to specify the Fifth and Sixth Amendments as bases for a judicially declared use immunity, trial counsel asked for immunity from prosecution for Mayhew on a "transaction" (the Triple J robbery) other than that about which he was being called to testify (the Galen's Market robbery). Thus, the request to the trial court did not precisely fit the parameters of either *use* or *transactional* immunity.

ferent contexts, thus providing little or no support for a judicially declared rule in the instant case.

*Daly* v. *Superior Court, supra,* 19 Cal.3d 132, held that a protective order could be made in a civil discovery proceeding granting a witness immunity from prosecution *only where the prosecuting official failed to object after notice.* (*Id.,* at p. 148.)

In *People* v. *Coleman, supra,* 13 Cal.3d 867, the Supreme Court held that the People could not use in their case-in-chief the probationer's statement at a revocation hearing held prior to the disposition of the criminal charges arising out of alleged violations of the conditions of probation. The judicial rule of exclusion would also afford protection of derivative and use immunity. (*Id.,* at pp. 889, 891-892.)

*Coleman* is of little help as that court carefully noted no third party's rights were among the constitutional interests demanding accommodation at a pretrial probation revocation hearing. Where a third party's rights are involved, the *Coleman* court observed the accommodation of conflicting interests in concurrent legal proceedings may not be so easy. (*Id.,* at p. 888.) A third party's rights *are* involved in this case as Mayhew asserted his Fifth Amendment right.

In *Tarantino* v. *Superior Court, supra,* 48 Cal.App.3d 465, the court held that judicially declared use immunity could be implied from Penal Code statutes (§ 1367 et seq.) which require a defendant to be examined by a court-appointed psychiatrist to determine competency to stand trial. The court noted both humanitarian and practical considerations called for judicially declared immunity. (*Id.,* at p. 469.)

No United States Supreme Court decision has construed the Fifth and Sixth Amendments to grant the trial court the power to confer judicially declared use immunity to a witness called by the defense. In fact, dicta in cases suggest the contrary. (See, e.g., *Davis* v. *Alaska* (1974) 415 U.S. 308, 320 [39 L.Ed.2d 347, 355, 94 S.Ct. 1105], quoting from *Alford* v. *United States* (1931) 282 U.S. 687, 694 [75 L.Ed. 624, 629, 51 S.Ct. 218], "'[N]o obligation is imposed on the court, such as that suggested below, to protect a witness from being discredited on cross-examination, short of an attempted invasion of his constitutional protection from self incrimination, properly invoked.'")

Recent federal decisions bring into focus the issue of whether judicial use immunity can be based on the Fifth and Sixth Amendments.

Most cases have ruled against the granting of judicial use immunity under these circumstances. (See, e.g., *United States* v. *Turkish* (2d Cir. 1980) 623 F.2d 769, 772, cert. den. 449 U.S. 1077 [66 L.Ed.2d 800, 101 S.Ct. 856]; *Grochulski* v. *Henderson* (2d Cir. 1980) 637 F.2d 50, 52; *United States* v. *Thevis* (5th Cir. 1982) 665 F.2d 616, 638-641.) Immunity was held to be proper in one case. (See *Government of Virgin Islands* v. *Smith* (3d Cir. 1980) 615 F.2d 964.[5]) We are persuaded by those courts which have rejected defendant use immunity.

Regarding the Sixth Amendment argument, we agree with the *Turkish* court's statement that: "While the prosecutor may not prevent or discourage a defense witness from testifying [citations] it is difficult to see how the Sixth Amendment of its own force places upon either the prosecutor or the court any affirmative obligation to secure testimony from a defense witness by replacing the protection of the self-incrimination privilege with a grant of use immunity." (*United States* v. *Turkish, supra*, 623 F.2d at p. 774.)

Moreover, a criminal proceeding is not "symmetrical" as the prosecution and defense have different rules, powers and rights. (*Id.*, at pp. 774-775.) Thus, there can be no *due process* violation based on any alleged unfair advantage inuring to the government which may grant use immunity to its witnesses over a defendant's ability to present a defense. In short, the Fifth Amendment does not create general obligations for prosecutors or courts to obtain evidence protected by lawful privilege. (*Id.*, at p. 777.)

Although we recognize the object of the trial process is to search for truth, the obstacles to a successful prosecution can be substantial even under use immunity. The government would have a "heavy burden" to prove that its evidence against the immunized witness had not been obtained as a result of his immunized testimony. (*Id.*, at p. 775.) Awareness of the obstacles to successful prosecution of an immunized witness may force the prosecution to curtail its cross-examination of the witness in the case on trial to narrow the scope of the testimony that the witness will later claim tainted his subsequent prosecution. Additionally, defense witness immunity could create opportunities for undermining

---

[5]Cited by the dissent, *post*, at page 823.

the administration of justice by inviting cooperative perjury among law violators. Codefendants could secure use immunity for each other and each immunized witness could exonerate his codefendant at a separate trial by falsely accepting sole responsibility for the crime, secure in the knowledge that his admission could not be used at his own trial for the substantive offense. (*Ibid.*)

See also *United States* v. *Thevis, supra*, 665 F.2d 616, 640, footnote 27, where the court stated: "The incentive for abuse is strong given that the witness, because of immunity, is in no worse a legal position for having testified, and because of the heavy burden on the government to prove lack of taint, the witness in practice may improve his legal position. [¶] Nor are we convinced that perjury prosecutions are an adequate deterrent. Successful perjury prosecutions are not common, and in many cases the penalty for the substantive crime will far surpass perjury penalties."

Finally, "An immunity decision . . . would require a trial judge, in order to properly assess the possible harm to public interests of an immunity grant, to examine pre-trial all the facts and circumstances surrounding the government's investigation of the case. Such collateral inquiries would necessitate a significant expenditure of judicial energy, possibly to the detriment of the judicial process overall, and would risk jeopardizing the impartiality and objectivity of the judge at trial." (*Id.*, at p. 640.) The *Thevis* court went on to conclude that there may be a danger of intrusion into other privileges (e.g., attorney-client, doctor-patient); thus, the Legislature should decide the issue whether judicial immunity is proper. (*Ibid.*)

In sum, even if the request made in the trial court in this case could be construed to be a request for *use* immunity, we are persuaded by the compelling arguments *against* a doctrine of judicially declared use immunity.

Thus, the trial judge in this case correctly rejected the defense request for immunity for the witness Mayhew.

## II.

After the jury returned its guilty verdict, appellant filed a motion for a new trial based on juror misconduct. Attached to the motion were declarations by defense counsel and a juror, one Delma Turman. Tur-

man stated: "The jury was originally deadlocked at six votes for guilty and six votes for not guilty. During our deliberations juror #11, Mrs. Hilda Fischer, told all the other jurors that she had past [sic] the scene of the alleged crime during the trial on the weekend prior to our deliberations. [¶] Mrs. Fischer went on to describe the relative size of the scene and strongly indicated that because of what she saw and related to all of the other jurors, that the defendant had to be lying, and therefore, he must be guilty. [¶] I did not and do not believe that the defendant is guilty of the crime charged. I held out as long as I could, but Mrs. Fischer kept repeating her claim of the defendant's dishonesty based on her view of the scene. I finally changed my vote to guilty. This change was influenced by Mrs. Fischer's statements concerning her view of the scene."

The People opposed the motion but did not file any counteraffidavits.

After argument, the trial court denied the motion, saying: "Taking the affidavit on its face, it does not show by the actions of juror Fischer that there was any misconduct in going by the scene. [¶] There is no indication in that affidavit that the juror deliberately went to the scene of the event for the purpose of making an investigation. [¶] The affidavit on its face shows that she drove by the area during a weekend. This was in the affidavit, in the evidence, that that was discussed in the jury room. [¶] However, there is no showing that in any way it was prejudicial to the defendant. I'm cognizant of the fact that during the course of the case that diagrams of the scene were received in evidence as well as several photographs of the scene. [¶] There is no showing here that there was any material difference between anything that Mrs. Fischer may have said in the jury room that produced evidence other than that which was already before the jury. [¶] And in any event, there is no showing that this was prejudicial to the defendant. I think counsel is quite correct that affidavits cannot be presented to impeach the jury's verdicts by delving into the subjective reasoning process of the jurors in the jury room."

Defense counsel noted the court erred because there were no diagrams actually introduced in evidence. The court replied that it recalled the photographs received in evidence were photographs showing the view of the scene as it existed at the time of trial, which was somewhat changed from the time of the offense. Hence, the jury was not misled as that difference was pointed out to the jury at the time they took the evidence.

■ Appellant now contends the observation of the location of the alleged crime scene constituted misconduct and the finding that there was no prejudice was not supported by substantial evidence. He argues that, since the other jurors were unable to observe the crime scene, they were not prepared to argue against the juror's conclusions. Moreover, the jury's impartiality was affected inasmuch as Ms. Turman eventually changed her vote to guilty under repeated pressure by Mrs. Fischer involving her observation of the scene and her opinion of the defendant's credibility. Appellant finally notes the court admitted a nonrepresentative picture of the market which was held up over proper objection that it would confuse the jury. The market had been rebuilt between the time of the crime and the time of the trial. Thereafter, a juror visited the scene and reported to the jurors that the market was not as the defendant had described it. Thus, the jury was contaminated from the repeated assertion by Mrs. Fischer that if the defendant had lied about the physical description of the market he must be guilty.

■ Jury misconduct raises a presumption of prejudice and, unless the prosecution rebuts that presumption by proof that no prejudice actually resulted, the defendant is entitled to a new trial. (*People* v. *Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91].)

■ While juror affidavits are admissible to impeach a jury verdict, a verdict may not be impeached by inquiry into the juror's mental or subjective reasoning process, and evidence of what the juror "felt" or how he understood the trial court's instructions is not competent. (*People* v. *Hutchinson* (1969) 71 Cal.2d 342, 350-351 [78 Cal.Rptr. 196, 455 P.2d 132]; *People* v. *Elkins* (1981) 123 Cal.App.3d 632, 636-637 [176 Cal. Rptr. 729]; *People* v. *Flores* (1979) 92 Cal.App.3d 461, 468-469 [154 Cal.Rptr. 851]; Evid. Code, § 1150, subd. (a).) Moreover, allegations by jurors that the juror who committed the misconduct "did not influence" their verdict are inadmissible under Evidence Code section 1150. (*People* v. *Pierce, supra*, 24 Cal.3d 199, 208, fn. 4.) Hence, Turman's allegations relating to the influence juror Fischer had on her would be inadmissible as the trial court indicated. (See also *People* v. *Flores, supra*, 92 Cal.App.3d 461, 468; Witkin, Cal. Criminal Procedure (1978 supp.) § 554A, pp. 876-878.)

■ Turning to the admissible portion of the affidavit, the general rule is that a juror's unauthorized visit to the scene of the crime will constitute misconduct. (*People* v. *Tugwell* (1917) 32 Cal.App. 520, 522-523 [163 P. 508]; *People* v. *Yee King* (1914) 24 Cal.App. 509, 513 [141 P. 1047].)

. . .

■ Here, the juror was considering and discussing with the other jurors "evidence" other than that which was received at trial. Such "evidence" cannot be a part of the jury's deliberations. (*Woebbe* v. *Sperry* (1941) 48 Cal.App.2d 340 [119 P.2d 743].) Thus, we conclude there was juror misconduct. "[W]hether a defendant has been injured by jury misconduct in receiving evidence outside of court necessarily depends upon whether the jury's impartiality has been adversely affected, whether the prosecution's burden of proof has been lightened and whether any asserted defense has been contradicted. If the answer to any of these questions is in the affirmative, the defendant has been prejudiced and the conviction must be reversed. On the other hand, since jury misconduct is not per se reversible, if a review of the entire record demonstrates that the appellant has suffered no prejudice from the misconduct, a reversal is not compelled." (*People* v. *Martinez* (1978) 82 Cal.App.3d 1, 22 [147 Cal.Rptr. 208].)

In *Martinez*, this court held that any allegation of prejudice due to juror misconduct in bringing maps into the jury room to evaluate testimony was negated by the record. (*Id.*, at pp. 22-25.) The court focused on such factors as: there was no inconsistency between the evidence presented at trial and the facts depicted on the maps; there was no dispute about the physical terrain and the maps did not impeach defendant's witnesses or contradict appellant's alibi defense; the prosecution's burden was not lightened, as appellant was convicted on evidence totally unrelated to the maps; finally, the maps contained information which related to factual matters of common knowledge and could not cause a bias among jurors against appellant. (*Id.*, at pp. 23-25; see also *People* v. *Phillips* (1981) 122 Cal.App.3d 69, 81-82 [175 Cal.Rptr. 703]; cf. *People* v. *Pierce, supra*, 24 Cal.3d 199, 209.)

In the unauthorized view cases, courts have found no prejudice where there was no issue as to the condition or locus of the accident (*Siemsen* v. *Oakland, S. L. & H. Electric Ry.* (1901) 134 Cal. 494, 498-499 [66 P. 672]), the conditions of the area had changed and the jurors could obtain nothing to corroborate evidence of the People's witnesses (*People* v. *Tugwell, supra*, 32 Cal.App. 520, 522-523), or where the juror could not have learned anything to plaintiff's detriment (*Anderson* v. *Pacific Gas & E. Co.* (1963) 218 Cal.App.2d 276, 280-282 [32 Cal.Rptr. 328]).

In the instant case, appellant contends there was prejudice based on the fact that Turman changed her vote to guilty under repeated pres-

sure by Fischer involving her observation of the scene and her opinion of appellant's credibility. However, the trial court properly ignored that part of the affidavit dealing with the influence on Turman because Turman was relating her reasoning process and how she was improperly swayed.

Next, it is difficult to see how Fischer's view of the scene could possibly have added anything to what the jurors already knew because pictures of Galen's Market and motorcycle shop were introduced into evidence. Moreover, although Fischer's view and the photographs displayed a slightly changed scene, as an addition had been built on the back of the motorcycle shop after one robbery, there was nothing inconsistent with the witness' description, including that of appellant's, regarding how Galen's looked when the robbery took place. In other words, Fischer's view did not contradict the evidence.

Significantly, the scene of the crime was not at issue and there were no conflicts in the evidence regarding the location; the scene was not critical to the outcome of the case. Also, the defense was that appellant did not know of the robbery and did not participate therein. The defense presented no evidence that the scene of the robbery somehow made appellant's participation in the robbery any less likely.

"However strictly the decisions may lay down the rule as to the effect of misconduct of the jury that may well have prejudiced the parties, it is settled in this state that a new trial will not be granted on that ground where the misconduct was of such a trifling nature that it could not in the nature of things have been prejudicial to the moving party, and that where it appears that the fairness of the trial has been in no way affected by such impropriety, the verdict will not be disturbed. [Citation.]" (*Kimic* v. *San Jose-Los Gatos, etc. Ry. Co.* (1909) 156 Cal. 379, 398 [104 P. 986].)

We conclude that any juror misconduct in this case did not cause prejudice to the appellant.

The judgment is affirmed.

Hanson (P. D.), J., concurred.

**ZENOVICH, Acting P. J.**—I respectfully dissent as to that portion of the majority opinion dealing with the grant of judicially declared immunity.

I believe the objection was sufficient in that it fairly apprised the trial court of the issue it was being called upon to decide. (*People* v. *Scott* (1978) 21 Cal.3d 284, 290 [145 Cal.Rptr. 876, 578 P.2d 123]; *People* v. *Sipress* (1975) 51 Cal.App.3d 98, 102-103 [123 Cal.Rptr. 884] [requiring a defendant who desires that the prosecution grant immunity to a defense witness to assert his claim in the trial court].)

As I read the record, defense counsel's statement that the request was "probably outside the statute as the motion was usually made by the district attorney" clearly implies that he was seeking a grant of judicial immunity even though he did not specifically request the court to grant such immunity and did not specify he was basing his claim on the Fifth and Sixth Amendments.

I begin by noting that there is California precedent for judicially declared use immunity. (See *Daly* v. *Superior Court* (1977) 19 Cal.3d 132, 146-147 [137 Cal.Rptr. 14, 560 P.2d 1193]; *People* v. *Coleman* (1975) 13 Cal.3d 867, 889-892 [120 Cal.Rptr. 384, 533 P.2d 1024]; *Tarantino* v. *Superior Court* (1975) 48 Cal.App.3d 465, 470 [122 Cal. Rptr. 61].) Even though these cases arose in different contexts, I believe that they establish sufficient authority in California for judicially declared use immunity.

I believe that a defendant's rights to the state's evidence to present witnesses in his own defense and to confront and cross-examine a witness on matters material to guilt or innocence should generally prevail over an insufficiently strong state interest. (See, e.g., *Roviaro* v. *United States* (1957) 353 U.S. 53, 60-62 [1 L.Ed.2d 639, 644-646, 77 S.Ct. 623] [involving a defendant's right to the identity of an informant]; *Jencks* v. *United States* (1957) 353 U.S. 657, 672 [1 L.Ed.2d 1103, 1114, 77 S.Ct. 1007]; see also *Brady* v. *Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 218, 83 S.Ct. 1194] [suppression of evidence by prosecution of evidence favorable to accused upon request violates due process where evidence is material to either guilt or punishment]; *Chambers* v. *Mississippi* (1973) 410 U.S. 284, 295-298, 302 [35 L.Ed. 2d 297, 308-312, 93 S.Ct. 1038] [right to impeach own witness prevailed over common law rule preventing this; hearsay rule should not be mechanically applied to deny defendant due process right to present evidence which was exculpatory]; *Washington* v. *Texas* (1967) 388 U.S. 14, 23 [18 L.Ed.2d 1019, 1025, 87 S.Ct. 1920] [state statute prohibiting defense from calling witness as accomplice violated defendant's Sixth Amendment right to have compulsory process for obtaining wit-

nesses in his favor]; *Davis* v. *Alaska* (1974) 415 U.S. 308, 319-320 [39 L.Ed.2d 347, 355, 94 S.Ct. 1105] [right to cross-examination outweighed state's right to protect anonymity of juvenile offenders]; and see Note, *Defendant-Witness Immunity* (1978) 30 Stan.L.Rev. 1211, 1229-1230.)

Under circumstances detailed below, I believe a defendant's right to compel another to testify over the latter's Fifth Amendment claim should be added to the above list.

First, a defendant has a due process right to present exculpatory evidence. (*Government of Virgin Islands* v. *Smith* (3d Cir. 1980) 615 F.2d 964, 970, relying on *Chambers* v. *Mississippi, supra*, 410 U.S. 284.) Thus, a defendant should not be denied access to witnesses who may provide exculpatory evidence.

Second, the Sixth Amendment compulsory process and confrontation clause provides support for judicial immunity when a defendant's need for exculpatory evidence outweighs the state's interest in limiting a defendant's access to such evidence. (See *Davis* v. *Alaska, supra*, 415 U.S. 308; *Washington* v. *Texas, supra*, 388 U.S. 14, 19 [18 L.Ed.2d 1019, 1023] [the right to offer the testimony of witnesses and to compulsory process clause means the "right to present a defense, [and] the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies"]; Note, 30 Stan.L.Rev., *op. cit. supra*, at pp. 1226-1230.) Moreover, the compulsory process clause places upon the state certain affirmative duties in securing testimony of witnesses in the defendant's behalf. (Note, *The Sixth Amendment Right to Have Use Immunity Granted to Defense Witnesses* (1978) 91 Harv.L.Rev. 1266, 1267.) Since the defendant has a fundamental right to present witnesses (*Washington* v. *Texas, supra*, 388 U.S. 14, 19 [18 L.Ed.2d 1019, 1023]), it follows the state has an affirmative duty to grant defense witness immunity and compel testimony under proper circumstances.

Third, the essential task of a criminal trial is to search for truth (*Government of Virgin Islands* v. *Smith, supra*, 615 F.2d at p. 971) and this purpose should not be frustrated.

Finally, there is a need to balance the forces between the prosecution and the accused. (Note, 30 Stan.L.Rev., *op. cit. supra*, at pp. 1232-1233.)

I note that the *Smith* court and commentators have set out certain rules and proposals regarding judicial use immunity. (See *Government of Virgin Islands* v. *Smith, supra,* 615 F.2d at pp. 972-973; Note, 91 Harv.L.Rev., *op. cit. supra,* at pp. 1277-1279; Note, 30 Stan.L.Rev., *op. cit. supra,* at pp. 1235-1241.) For instance, in *Smith,* the court noted that judicial use immunity must be clearly limited: immunity must be properly sought in the lower court; "the defense witness must be available to testify; the proffered testimony must be clearly exculpatory; the testimony must be essential; and there must be no strong governmental interests which countervail against a grant of immunity." (*Smith, supra,* 615 F.2d at p. 972.) On the record before us, I believe that defense counsel clearly satisfied the requirements of *Smith.*

Counsel represented that he had received a detailed statement from Mayhew as to what occurred between Mayhew and Sutter on the date in question. That statement indicated that Mayhew alone planned and carried out the robbery. This representation clearly met the requirements of clear, exculpatory, and available testimony. Since the probation officer's report was not before the court at the time the motion was made, this court cannot consider its significance in testing the exercise of the court's discretion. (See *People* v. *Massie* (1967) 66 Cal.2d 899, 919 [59 Cal.Rptr. 733, 428 P.2d 869].)

Moreover, appellant's need for the exculpatory evidence certainly outweighs the prosecution's interest in limiting his access to such evidence. I find nothing in the record before us which would prevent the district attorney from isolating its evidence against Mr. Mayhew as to the second robbery. As appellant argues, the evidence introduced at the preliminary hearing was thus "sterilized" and the prosecutor's burden of proving an independent source for any new evidence would be very small.

I would hold the trial court erred in denying appellant's request for judicially declared use immunity and reverse the judgment.

Appellant's petition for a hearing by the Supreme Court was denied October 13, 1982.