[No. A017774. First Dist., Div. One. Jan. 25, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
CHESTER LAWRENCE RYNER, Defendant and Appellant.

**COUNSEL**

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Court of Appeal, and Philip M. Brooks, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Linda Ludlow and Nathan D. Mihara, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

NEWSOM, J.—At 10:30 p.m. on May 5, 1981, the San Jose Police Department responded to a report of a shooting at the Red Spark Lounge, a bar in San Jose. When the officers arrived, the bar was in a state of chaos. A woman, later identified as Darlene Mejia, was lying on the floor, the victim of fatal gunshot wounds to the liver and heart. Two other bar patrons suffered severe gunshot wounds to the chest and head, respectively. A third man incurred a superficial wound. None of the victims was able to identify the assailant, but others present at the scene gave testimony incriminating appellant.

Adolph Sanchez was the bartender on duty at the Red Spark Lounge when the shooting occurred. He recalled that both appellant and codefendant Danny Cordova became involved in an argument with other bar patrons on the dance floor, with appellant being the person doing most of the yelling. According to Sanchez, appellant, who looked Mexican, was wearing a brown Pendleton shirt buttoned only at the top ("chollo" style), jeans, and had curly hair and a mustache. Sanchez directed the attention of Isaac Hernandez, the bar's bouncer, to the disturbance.

Isaac Hernandez testified that at his direction appellant, carrying a beer, was escorted outside by friends. When appellant tried to return, Hernandez confiscated his beer and again demanded he depart. Subsequently, Hernandez was taunted from outside by appellant and his friends, but did not reply. Soon thereafter, one of appellant's companions rushed into the bar and yelled, "He's got a gun." Hernandez immediately advised bartender Sanchez to call the police, then heard five or six gunshots, feeling the "pressure" of a bullet fly past his right side. He jumped over the bar to cover.

While Hernandez could not identify appellant as the person responsible for the shooting, he did select a brown Pendleton shirt in which appellant was dressed at the time of his arrest as the same one worn by appellant in the bar on the night of the shooting. Other witnesses corroborated Hernandez' testimony that appellant, or someone similar in appearance, was the person who had an argument with the bouncer just before the shooting.

One witness who observed the altercation between appellant and Hernandez was Victor Garcia. According to Garcia's testimony, a man in a brown

plaid Pendleton shirt worn "chollo" style, and who had been arguing with Hernandez, resembled appellant. Like Sanchez and Hernandez, Garcia felt that appellant appeared drunk or "on something" because of the glassy look in his eyes. When the shooting started, Garcia looked toward the door of the bar and saw the forearm of a person firing a small caliber revolver. According to Garcia, the shooter was wearing the same Pendleton shirt worn by the person twice earlier ejected from the bar.

Andrew Armienta, who in return for his testimony had been promised favorable consideration in a drunk driving prosecution testified that he saw appellant and his codefendant leave the bar after an argument with the bouncer. Momentarily, he heard gunshots in the bar, and saw appellant standing by the door with a pistol. He could see part of appellant's face and the Pendleton shirt in which appellant was attired that evening. After the shooting, Armienta went outside and observed appellant and a companion flee in a small green car. He saw the same car again at the scene of the arrest.

Rudy Chavez saw the shooting as he left the Red Spark Lounge. He observed flashes from outside the bar. The person doing the shooting appeared to him to be alone and perhaps was wearing a brown Pendleton shirt. It appeared that the shots were being aimed at the bouncer. Chavez could not, however, identify appellant as the assailant in court. According to Officer Patrick Boyd of the San Jose Police Department, Chavez had previously stated that he might be able to identify the person who did the shooting, but seemed reluctant or scared to do so.

Other witnesses observed men fleeing the scene of the crime immediately after the shooting. At trial, Leo Rodriguez testified that he was sitting outside the bar when the shooting occurred. He saw approximately six people run from the bar, two of whom fled to a small car parked in front of a nearby Newberry's store, one of them being a man he recognized as involved in an earlier altercation with the bouncer. Deborah Carr testified that she heard the shots from outside the Red Spark Lounge, then observed "two guys" run from the bar to a light green car and quickly leave the area.

Amelia Johnston and Mary Carbuena had talked with appellant and another man at Alum Rock Park in San Jose earlier that day. Mary was under the influence of phencyclidine (PCP) and could not remember the encounter. Amelia testified that appellant had a handgun and fired it once in the park. Later that evening, they again saw appellant at the Red Spark Lounge. According to Amelia, appellant wanted to talk with Mary, but she refused. An argument ensued, whereupon the bouncer asked appellant to leave. Neither Amelia nor Mary saw who later fired the shots in the bar.[1]

---

[1] At trial, Mary testified that she did not recall seeing appellant at the bar, but in her statement to the police on the night of the shooting she mentioned that appellant had a pistol with him at the Red Spark Lounge that night.

That same evening between 10:30 and 11:00, the police went to an address at Winter Park Way where Officers Boyd and John Rutledge spotted a blue-green, four-door Rambler parked in a driveway and partially across the sidewalk. Both the passenger and driver side doors of the car were open. Codefendant Cordova was arrested near the car, and appellant was seen crouched next to a nearby Mercury Monarch occupied by Charlene Brown and Glenda Stewart. The officers saw appellant reach into his pants pocket and appear to throw something into the Mercury. Officer Rutledge repeatedly ordered appellant to rise and move away from the car, and, after a brief delay, he complied. Appellant was immediately handcuffed and arrested.

In the car was found a small amount of change and four .22 magnum caliber cartridges. A similar bullet was later found in appellant's pants pocket. Subsequent laboratory analysis showed that the bullets seized from the car and appellant's pants had the same design and construction characteristics as the one which killed Darlene Mejia and injured the other bar patrons.

Appellant was arrested wearing a brown plaid Pendleton shirt. His fingerprints were found on the blue-green Rambler. Dabbings taken from appellant's hands and shirt were analyzed under an electron microscope by an expert, who testified that particles were found which he identified as probably being gunshot residue.

Appellant did not testify in his own defense at trial. He did offer in rebuttal the testimony of San Jose Police Officer Richard Daulton, who recounted an interview with Andrew Armienta. Dalton testified that Armienta never told him about seeing anyone holding a gun at the door of the bar after the shooting. Neither had Armienta then mentioned that the person who sped away in the green car was the one who did the shooting.

Appellant first complains that he was denied a fair trial because of a conversation which occurred during the course of the trial between Officer Patrick Boyd, a prosecution witness, and a number of the jurors.

The record shows that during a morning recess taken while Officer Boyd was on the stand, the latter engaged in a conversation in the hallway outside the courtroom with some of the jurors. Neither Boyd's testimony nor any aspect of the case was discussed. Rather, topics of conversation included a recent 49er playoff game, the kind of gun Boyd carried, weapons in general, the officer's experiences on the Oakland and San Jose Police forces, his Vietnam military service, and the fact that he was fatigued after working graveyard shift the night before. The discussion between Boyd and the ju-

rors was friendly and apparently loud, as at one point the bailiff asked the group to quiet down.

Upon learning of this conversation, appellant and codefendant Cordova moved for a mistrial on the ground of juror misconduct. A hearing on the motion was held, at which Boyd testified that he did not discuss any aspects of the case with the jurors, and merely participated in the conversation to be friendly and maintain good public relations. The jurors involved in the discussion with Boyd, apparently seven in number, recounted the content of the conversation. All jurors stated that the matter being tried was not mentioned, and none felt that their ability to fairly and impartially decide the case according to the evidence would be compromised by their conversation with Boyd.

Appellant contends that prejudice must be presumed from the juror misconduct, and was not satisfactorily rebutted by the prosecution.

 We agree that juror misconduct occurred despite the fact that Officer Boyd and the jurors did not discuss any matters related to the case.

" ' " "The right of unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to trial by jury guaranteed by the Constitution." ' " ' " (*People* v. *Diaz* (1984) 152 Cal.App.3d 926, 933 [200 Cal.Rptr. 77]; *People* v. *Galloway* (1927) 202 Cal. 81, 92 [259 P. 332], quoting *Weathers* v. *Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 110 [95 Cal.Rptr. 516, 485 P.2d 1132].) In *Turner* v. *Louisiana* (1965) 379 U.S. 466 [13 L.Ed.2d 424, 85 S.Ct. 546], two deputy sheriffs who were important prosecution witnesses were also placed in charge of the sequestered jury throughout a three-day murder trial. While it was not established that the deputies discussed the case directly with any members of the jury, the United States Supreme Court recognized the "extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution." (*Id.*, at p. 473 [13 L.Ed.2d at p. 429].) Emphasizing the "intimate association throughout a three-day trial" between the jurors and deputies, the court concluded: "It would have undermined the basic guarantees of trial by jury to permit this kind of an association between the jurors and two key prosecution witnesses who were *not* deputy sheriffs. But the role that Simmons and Rispone played as deputies made the association even more prejudicial. For the relationship was one which could not but foster the jurors' confidence in those who were their official guardians during the entire period of the trial. And Turner's fate depended upon how much confidence the jury placed in these two witnesses." (*Id.*, at p. 474 [13 L.Ed.2d at pp. 429-430].)

In the present case, the "association" was not nearly so intimate or lengthy as in *Turner;* nevertheless the jurors' friendly conversation with Boyd might well have caused them to accord his testimony greater credibility. Officer Boyd admitted that he participated in the discussion to foster good public relations. He may not have conversed with the jurors with the intent of ingratiating himself to them, but that could have been the result of the encounter. We add that the subjects of the conversation were such as to perhaps add to the image of Boyd as a capable and trustworthy police officer.

The Attorney General stresses the fact that the jurors did not violate their obligation under Penal Code section 1122 to avoid conversing "among themselves or with anyone else on any subject connected with the trial . . . ." We acknowledge this to be so, but note that misconduct encompasses acts other than those proscribed by section 1122. By engaging Officer Boyd in an amiable discussion of police work and other topics of mutual interest, we conclude that the jury members did a disservice to appellant's right to a fair and impartial tribunal. (*Turner, supra.*)

We must next decide whether the misconduct at issue requires reversal. ■ Since jury misconduct is not prejudicial per se (*People* v. *Sutter* (1982) 134 Cal.App.3d 806, 820 [184 Cal.Rptr. 829]), such misconduct raises a presumption of prejudice, which can be rebutted by proof that no prejudice actually resulted. (*People* v. *Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91].) In *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388 [185 Cal.Rptr. 654, 650 P.2d 1171], our high court explained that the presumption of prejudice arising from juror misconduct "may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct." (*Id.,* at p. 417; see also *People* v. *Diaz, supra,* 152 Cal.App.3d 926, 934.)

■ Some of the factors to be considered when determining whether the presumption has been rebutted are as follows: the strength of the evidence that misconduct occurred; the nature and seriousness of the misconduct; whether the prosecutor's burden was lightened by the misconduct, the effect of the misconduct upon the defense case; and the probability that actual prejudice may have ensued. (*Hasson, supra,* at p. 417; *Diaz, supra,* at p. 935; *People* v. *Sutter, supra,* 134 Cal.App.3d 806, 820.)

We agree with appellant that the jurors' statements as to the effect of the misconduct upon their ability to fairly and impartially decide the case cannot be considered. Evidence Code section 1150 prohibits use of evidence of the

jurors' subjective reasoning processes either to establish misconduct or rebut the presumption of prejudice.[2] (*People* v. *Sutter, supra,* 134 Cal.App.3d 806, 819; *People* v. *Flores* (1979) 92 Cal.App.3d 461, 468 [154 Cal.Rptr. 851]; *People* v. *Guzman* (1977) 66 Cal.App.3d 549, 559, fn. 7 [136 Cal.Rptr. 163]; *Spain* v. *Rushen* (N.D.Cal. 1982) 543 F.Supp. 757, 774-775.) In *Sutter, supra,* at page 819, the court commented that "allegations by jurors that the juror who committed misconduct 'did not influence' their verdict are inadmissible under Evidence Code section 1150." As explained in *People* v. *Phillips* (1981) 122 Cal.App.3d 69, 81 [175 Cal.Rptr. 703]: "[T]he presumption of prejudice cannot be overcome by a juror's affidavit denying that misconduct had any effect on the deliberations. 'The law, in its wisdom, does not allow a juror to purge himself in that way.' "

Thus, discounting the jurors' subjective feelings on the effect of the misconduct, we must look at whether the presumption of prejudice has been rebutted by an objective evaluation of the misconduct in light of the entire record. (*People* v. *Sutter, supra,* 134 Cal.App.3d 806, 820; *People* v. *Phillips, supra,* 122 Cal.App.3d 69, 81.)

Having done so, we are unable to characterize the juror misconduct at issue here—regrettable though it is—as a serious violation. The conversation between the jurors and Officer Boyd was limited to topics unrelated to the case at hand. It was a brief encounter, as opposed to the continuous association found objectionable in *Turner.* In *Pierce, supra,* 24 Cal.3d 199, 208, our state high court found prejudicial communication by a juror with an investigating officer which "did not deal with mere social amenities unrelated to the trial . . . ." Here, in contrast "mere social amenities" were all that the jury members and Officer Boyd exchanged. The conversation was so brief and innocuous that we regard it as trivial misconduct. (*People* v. *Goff* (1981) 127 Cal.App.3d 1039, 1046 [179 Cal.Rptr. 190].)

Turning to its effect upon the trial, it is noteworthy that Officer Boyd was not a critical prosecution witness. He was not an eyewitness to the crime; rather, he participated in appellant's arrest as an investigating officer. His testimony related in the main to some incriminating physical evidence—particularly bullets consistent with those found at the Red Spark Lounge—seized from appellant at the arrest scene. And this testimony was merely

---

[2]Subdivision (a) of section 1150 provides: (a) Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.

cumulative, Officer Rutledge and Glenda Stewart having testified to the same facts. The sole remaining important feature of Officer Boyd's testimony was his statement that Leo Rodriguez had identified appellant as the gunman in a pretrial statement, which allowed the prosecutor to argue that Rodriguez was failing to testify in full at trial. Such evidence was relevant, but in our view hardly critical.

Nor was the misconduct particularly damaging to the defense case, which was predicated upon misidentification or lack of positive identification of appellant as the assailant. While, therefore, the conversation between Officer Boyd and the jurors might well have bolstered the former's credibility as a witness, we conclude that it had little or no adverse effect upon the efforts of the defense to challenge the identifications.

We view the cumulative evidence against appellant as strong. The eyewitness identifications, although not without weaknesses, remain seriously incriminating in their impact. The physical evidence, consisting of the bullets found in appellant's possession and the gunpowder residue on his hands and shirt, fortified the identifications, as did the remaining circumstantial evidence. Given the strength of the prosecution's case, the trifling nature of the misconduct and its minimal impact upon the case, we conclude that the record demonstrates no actual prejudice to appellant from the indiscretions of the jurors. (*People* v. *Sutter, supra,* 134 Cal.App.3d 806, 821; *People* v. *Goff, supra,* 127 Cal.App.3d 1039, 1046; *People* v. *Hill* (1980) 110 Cal.App.3d 937, 943 [168 Cal.Rptr. 272].)

 We turn next to appellant's contention that the prosecutor committed misconduct by commenting upon his failure to testify in violation of *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]. Appellant objects to the following remark, made by the prosecutor in the course of explaining the difficulty of producing eyewitnesses to the shooting: "The person or people who had the most access to those people are not the police. The one who can tell you what happened, who can bring you the name and addresses of witnesses who saw exactly what happened is right there, Chester Ryner."[3]

 We proceed from the well established premise that comment upon appellant's silence by a prosecutor constitutes a violation of the accused's

---

[3]The full pertinent portion of the prosecutor's comment was as follows: "The point I'm making, ladies and gentlemen, the police are aliens, aliens in that environment. I don't care what the police officer's name is, what his background is. He's an alien in that environment. The people who know what happened are not coming forward. The person or people who had the most access to those people are not the police. The one who can tell you what happened, who can bring you name and addresses of witnesses who saw exactly what happened is right there, Chester Ryner."

right not to incriminate himself. (*Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240]; *People* v. *Redmond* (1981) 29 Cal.3d 904 [176 Cal.Rptr. 780, 633 P.2d 976]; *People* v. *Poon* (1981) 125 Cal.App.3d 55, 84 [178 Cal.Rptr. 375].) In *Griffin, supra,* 380 U.S. 609, the seminal case on this subject, the prosecutor commented that the defendant, who might be the only one who could tell the story of a murder, refused to take the stand. After pointing out to the jury that the murder victim was unable to "tell her side of the story," the prosecutor added: "The defendant won't." (*Id.,* at p. 611 [14 L.Ed.2d at p. 108].) The court found this statement to be an improper "comment by the prosecution on the accused's silence" in contravention of the Fifth and Fourteenth Amendments. (*Id.,* at p. 615 [14 L.Ed.2d at p. 110].)

Thus, "*Griffin* forbids either direct or indirect comment upon the failure of the defendant to take the witness stand." (*People* v. *Jackson* (1980) 28 Cal.3d 264, 304 [168 Cal.Rptr. 603, 618 P.2d 149]; see also *People* v. *Frausto* (1982) 135 Cal.App.3d 129, 146 [185 Cal.Rptr. 314].) "The rule, however, does not extend to comments upon the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses." (28 Cal.3d at p. 304.)

The Attorney General argues that the prosecutor's comment in the case at bench amounted to no more than permissible comment upon the evidence. We cannot agree. In our view, the jury could well have interpreted the prosecutor's statement as a reference to appellant's refusal to take the stand and clarify the gaps in the evidence. The prosecutor's intent is irrelevant; it is the effect of the remark upon the jury which we must evaluate. We cannot ignore a prosecutor's comment which, like the one here at issue, draws attention to the defendant's failure to testify, even if made in the process of accounting for the demeanor of witnesses or deficiencies in the People's case. (*People* v. *Vargas* (1973) 9 Cal.3d 470, 476-477 [108 Cal.Rptr. 15, 509 P.2d 959]; *People* v. *Medina* (1974) 41 Cal.App.3d 438, 457 [116 Cal.Rptr. 133].)[4]

We must next determine if the *Griffin* error was prejudicial according to the constitutional standard of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (*People* v. *Gaines* (1980) 103 Cal.App.3d 89, 97 [162 Cal.Rptr. 827].) Our high court has stated that "such indirect, brief and mild references to defendant's failure to testify, without any suggestion whatever that an inference of guilt should

---

[4]In *Vargas, Griffin* error was found in the prosecutor's statement that "there is no denial at all that they [defendants] were there" (9 Cal.3d at pp. 476-477); and in *Medina,* the court concluded that the prosecutor had been guilty of misconduct by claiming that the testimony of his witnesses was "unrefuted" (41 Cal.App.3d at p. 457).

be drawn therefrom, are uniformly held to constitute harmless error." (*People* v. *Jackson, supra,* 28 Cal.3d 264, 305.) We so conclude here, based both upon the strength of the prosecution's case and the inconsequential nature of the misconduct. We note that the prosecutor neither emphasized the remark nor argued that appellant's silence reflected adversely upon his credibility. We find the *Griffin* error harmless. (*People* v. *Fondron* (1984) 157 Cal.App.3d 390, 401 [204 Cal.Rptr. 457]; *People* v. *Frausto, supra,* 135 Cal.App.3d 129, 146-147; *People* v. *Singleton* (1980) 112 Cal.App.3d 418, 423 [169 Cal.Rptr. 333].)

■ Appellant cites as further misconduct two comments made by the prosecutor during his opening statement. First, appellant objects to the following remark: "I believe the evidence will show that man right over there took a gun, pointed inside a crowded bar and fired six shots killing one person and critically wounding two others. That man right there, a vicious and unreasoned act." The trial court sustained appellant's objection to this and cautioned the jury to disregard it as argumentative.

We are unable to agree that the comments were improper. The prosecutor was entitled to state his theory of the case in the course of the opening statement, and in that way " '. . . prepare the minds of the jury to follow the evidence and more readily discern its materiality, force and effect.' " (*People* v. *Ramos* (1982) 30 Cal.3d 553, 575 [180 Cal.Rptr. 266, 639 P.2d 908].) It is not misconduct merely to postulate what the evidence would arguably prove.

Appellant also complains of the following statement, made by the prosecutor in the course of his opening remarks: "Leo Rodriguez will come in, and he said 'Yeah, I saw two people running,' he won't say it quite that positively. He will come in here screaming and kicking, probably unhappy about being here, probably not wanting to get involved." The trial court sustained defense counsel's objection to this statement as based upon speculation about the witness' mental process. The remark was improper as unsupported by the record, but again was so trivial in its impact as to be harmless. (*People* v. *Brown* (1980) 110 Cal.App.3d 24, 36 [167 Cal.Rptr. 557].)

The prosecutor made additional statements during his closing argument which find no support in the record. Referring to witness Arthur Legrande, also known as "Suki," the prosecutor said: "Suki, Suki who hid the gun and won't tell us where it is." The jury was directed to disregard this remark. Later, the prosecutor stated: "I mean, we are all familiar with the papers. There were more homicides in San Jose last year than there ever were." Objection to this comment was sustained. And as part of his rebuttal

argument, in response to appellant's contention that the source of the gunpowder residue on his hands and clothing might have been the police officers' who arrested him, the prosecutor explained: "Ladies and gentlemen, when a police officer uses his gun, every time he fires that gun, the gun should be cleaned, and when you clean a gun you remove the gunshot residue." Again, the trial court sustained appellant's objection to this comment as not supported by the record.

■ While we agree that all of such remarks were objectionable, none of them had more than minor impact. The defense was not particularly compromised by them, nor did they lighten the prosecutor's burden. None of such unsupported statements had any direct bearing on the critical issues in the case. In light of the strength of the case against appellant, it is not reasonably probable that a result more favorable to appellant would have been reached in the absence of the misconduct. Reversal is accordingly not required. (*People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].)[5]

■ One further instance of misconduct is cited by appellant; it is the following statement made by the prosecutor during his examination of a witness and in response to an objection made by Mr. Schroeder, counsel for appellant's codefendant: "Withdraw my question at this time, your honor. I'm sure by this time she [the witness] remembers the statements given to her by Mr. Schroeder." We condemn this remark as reflective of poor judgment and unprofessional conduct, but we again find the misconduct insignificant and harmless. Assessing the cumulative effect of the misconduct, as we must (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 580-581 [189 Cal.Rptr. 855, 659 P.2d 1144]; *People* v. *Hudson* (1981) 126 Cal.App.3d 733, 741 [179 Cal.Rptr. 95]), we conclude that no prejudice appears.

---

[5]Our finding that the prosecutorial misconduct does not warrant reversal of appellant's conviction should not be viewed as condoning the deputy district attorney's conduct. On the contrary, we consider his actions highly improper and extremely serious, particularly in light of the fact that he has been the subject of at least one published opinion in which a criminal conviction had to be reversed in large measure because of his misconduct.

Section 6086.7 of the Business and Professions Code provides that when we reverse a conviction because of prosecutorial misconduct we must refer the matter to the State Bar for investigation with regard to the appropriateness of initiating disciplinary action against the attorney. Even though we do not believe that reversal is in order, and despite the fact that section 6086.7 took effect after trial of this case, this attorney's conduct cannot be ignored.

Accordingly, pursuant to our inherent judicial power to discipline attorneys (see 1 Witkin, Cal. Procedure (2d ed. 1970) Attorneys, § 186, p. 193 et seq.), we are reporting the matter to the State Bar for investigation, and we are informing the deputy district attorney of this referral.

The judgment is affirmed.

Racanelli, P. J., and Holmdahl, J., concurred.

A petition for a rehearing was denied February 22, 1985, and appellant's petition for a hearing by the Supreme Court was denied April 4, 1985. Bird, C. J., was of the opinion that the petition should be granted.