Filed 5/18/22  Galyardt v. Specialized Loan Servicing CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| MICHELLE C. GALYARDT, | |
| Plaintiff and Respondent, | E074731 |
| v. | (Super.Ct.No. MCC1600152) |
| SPECIALIZED LOAN SERVICING LLC et al, | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Rick S. Brown, Judge. (Retired judge of the Santa Barbara Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part; reversed in part.

The Ryan Firm, Timothy M. Ryan, Andrew Mase and Katherine K. Meleski for Defendants and Appellants.

Louis White Law, Jamil L. White, Andrey R. Yurtsan; Esner, Chang & Boyer, Stuart B. Eisner, Andrew N. Chang and Kathleen J. Becket for Plaintiff and Respondent.

1

Defendant and appellant Residential Mortgage Solution (the Bank) purchased a loan that was secured by a deed of trust on a house, which plaintiff and respondent Michelle Galyardt (Galyardt) owned. Defendant and appellant Specialized Loan Servicing (the Servicer) was the servicer for the loan. The trustee for the deed of trust foreclosed on Galyardt's house. Galyardt sued the Bank and the Servicer (collectively, the Lenders) for intentional misrepresentation, negligent misrepresentation, and fraudulent concealment.

Following an 11-day jury trial, the jury found in favor of Galyardt on the intentional misrepresentation and negligent misrepresentation causes of action. The jury awarded the following damages: (A) $8,232.31 for economic damages; (B) $430,000 for past non-economic damages; (C) $480,000 for future non-economic damages; (D) $2,160,000 in punitive damages against the Servicer; and (E) $680,000 in punitive damages against the Bank.

The Lenders raise nine issues on appeal. First, the Lenders contend the trial court erred by excluding evidence of Galyardt's loan modifications. Second, the Lenders assert substantial evidence does not support the punitive damages awards. Third, the Lenders contend the punitive damages award against the Bank was improper because the evidence reflects the Bank had a negative net worth. Fourth, the Lenders assert the punitive damages awards were excessive. Fifth, after the Lenders pointed out, during closing argument, that Galyardt had failed to provide evidence of the Lenders' finances, the trial court erred by bifurcating the issue of the amount of punitive

2

damages, over the Lenders' objection, and ordering the Lenders to provide evidence of their finances.

Sixth, the Lenders assert the trial court erred by denying their motion for mistrial, which was based on juror misconduct. Seventh, the Lenders contend the trial court failed to conduct an adequate inquiry into the juror misconduct. Eighth, the Lenders assert there was a pattern of juror misconduct in the case. Ninth, the Lenders contend the trial court lacked authority to grant relief from a stipulation pertaining to the admissibility of certain exhibits. We affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL HISTORY

From 1991 to 2006, Galyardt and her husband, Jeffrey Galyardt (Husband), owned a house in Spring Valley, in San Diego County. Galyardt and Husband sold the house in Spring Valley and made $100,000 in profit from the sale. In September 2006, Galyardt obtained a bank loan of $374,750 to purchase a house in Hemet (the House) for $475,000. Galyardt paid the $100,000 from the Spring Valley sale to purchase the House.

In September 2013, Galyardt missed payments on the loan for the House. The loan payments were missed due to Husband being injured at work and his income being reduced after his disability benefits terminated.

In addition to the missed loan payments, Galyardt's account developed an escrow shortage, which means the Lenders were paying the taxes and insurance for the House, but Galyardt was not giving the Lenders the money for those payments. The Lenders pay the taxes on loans that are in arrears because "taxes are a super priority lien above

the mortgage." The Lenders pay the insurance on loans that are in arrears because "properties need[] to be insured against any fire, damage, vandalism, whatever could happen." In June 2015, Galyardt had an escrow shortage of $2,186. In order to assist Galyardt, the Servicer divided that sum into 36 monthly payments of $60.73, which was added to Galyardt's monthly loan payments.

In fall 2015, Galyardt's monthly loan payment was approximately $2,006.52. That amount "included $1,432 of principal, $400 approximately of taxes, $100 of insurance, and $60.73 for the [escrow shortage]." In 2015, Husband graduated from nursing school, obtained a job as a registered nurse, and began earning more money than he earned prior to his injury. Galyardt and Husband's monthly income was $7,000 to $8,000.

In September 2015, Galyardt applied for the Keep Your Home California (KYHC) program. KYHC was a government program that helped borrowers who were $54,000 or less in arrears on their home loans. KYHC aided borrowers by paying up to $54,000 to have their loans reinstated. Banks and loan servicers were not required to participate in the KYHC program—it was voluntary. If a lender or servicer did not want to participate in the KYHC program for a particular loan, it could decline to do so by sending a written objection to KYHC.

If the Servicer chose to participate in the KYHC program, then the Servicer had to send KYHC paperwork verifying the reinstatement amount for the loan at issue. The reinstatement amount provided by a servicer to KYHC had to be valid for a minimum of 21 days. In February 2016, there was not a maximum number of future days that could

4

be included for the validity of the reinstatement amount. Generally, servicers provided reinstatement amounts that were valid for 21 to 40 days. However, if KYHC received a reinstatement amount that projected more than 30 days in the future, then KYHC "would contact the servicer and request them to submit the total past due to exclude one of the future—the future payment."

In September 2015, the Servicer sent Galyardt a letter reflecting that her loan reinstatement amount was $47,725.57 for payments due through September 1, 2015. Galyardt applied for assistance from KYHC in September 2015. In October 2015, the Servicer sent Galyardt a letter reflecting that her loan reinstatement amount was $52,289.96 for payments due through November 1, 2015. Also in October 2015, a "Notice of Default and Election to Sell Under the Deed of Trust" (all caps. omitted) was recorded by the Trustee, the Law Offices of Les Zieve (the Trustee).

In November 2015, the Servicer reported to KYHC that the reinstatement amount for Galyardt's loan was $58,482.51 if the reinstatement date were January 2, 2016. It was the Servicer's policy to project two months into the future when giving a reinstatement amount and date to KYHC. The Servicer added the two future months because that is how it was trained by KYHC to calculate reinstatement dates. In addition to the monthly loan arrears, the Servicer separately included the $2,186 for the escrow shortage in the fees owed by Galyardt. That amount had already been divided into 36 payments and added to the monthly loan payment. Thus, if the $2,186 had been paid along with the monthly loan arrears, then the $2,186 would have been paid twice.

5

On November 30, 2015, KYHC denied Galyardt's application due to her reinstatement amount being more than $54,000.

In December 2015, the Servicer sent Galyardt a letter reflecting the reinstatement amount was $56,453.29 for payments due through December 1, 2015. On December 3, 2015, Husband called the Servicer and spoke to a representative named Ron. Husband told Ron that Galyardt would make a $4,400 payment that would bring the reinstatement amount below $54,000. Ron told Husband to fax a letter to the Servicer explaining that Galyardt would pay the $4,400 difference between the reinstatement amount and the $54,000. Galyardt sent the letter to the Servicer and overnighted a cashier's check for $5,000.

On December 29, 2015, Galyardt reapplied to KYHC. In January 2016, the Servicer sent Galyardt a letter reflecting the reinstatement amount was $55,272.80 for payments due through February 1, 2016. The $5,000 payment was reflected in the accounting that totaled $55,272.80. The $55,272.80 reinstatement amount was valid through February 12, 2016.

On January 11, 2016, the Bank sent the Servicer a note that read, " '[The Bank] wants to make sure nothing will hinder a sale date from being issued in January 2016. Who can [the Bank] speak to regarding this loan to make sure that the foreclosure sale date is proceeding? It looks like [the Servicer] claims he is working with [KYHC] and [the Servicer] took the [$5,000] monies on file posted [*sic*]. These funds should not be posted, and foreclosure should proceed, unless a full reinstatement is received. If there

is no full reinstatement, the money should be returned. We don't want to hold up the foreclosure process.' "

On January 14, 2016, Galyardt sent a $2,000 check to the Servicer and a letter explaining that the $2,000 was meant to pay the difference between the reinstatement amount and the $54,000. On January 22, 2016, the Servicer sent Galyardt a letter reflecting the reinstatement amount was $53,272.80 for payments due through February 1, 2016. That reinstatement amount was valid through February 8, 2016. On January 28, 2016, the Trustee recorded a Notice of Trustee's Sale with a sale date of February 26, 2016.

On February 1, 2016, Husband called the Servicer and spoke with a representative named Emily. The following is an excerpt of their conversation:

"[Emily]: This is good through . . . let me see. The figures are good through February 8th, and yeah, that is the last one, the $53,272.80 that you just read off to me. It's good only through the 8th of February.

"[Husband]: So if they sent off the agreed today [*sic*] to you guys, so since that is so . . . theoretically tomorrow, you guys could send that amount to . . . I mean, verify that amount to [KYHC], correct?

"[Emily]: Yeah, I mean that's what's showing on your last reinstatement quote. It does specifically state the above figures are good through February 8th."

As the call continued, Emily asked, "Okay, now let me ask you, when did they tell you that they were going to bring this current for you, reinstate? Did they give you a date when they'd be reinstating the loan?" At that point, the call dropped.

On February 5, 2016, Galyardt sent the Servicer another $2,000 to keep the reinstatement amount below $54,000. On February 8, 2016, the Servicer sent Galyardt a letter reflecting her total reinstatement amount was $51,339.15 for payments due through February 1, 2016. The February 5th $2,000 check was not included in the accounting that totaled $51,339.15. The Servicer rejected the $2,000 due to the House being in foreclosure and the Servicer no longer accepting partial reinstatement payments. The $51,339.15 reinstatement amount was valid through February 16, 2016.

On February 8, 2016, the Servicer reported to KYHC that the reinstatement amount for Galyardt's loan was $59,646.25 if the reinstatement date were April 3, 2016. At trial, an expert testified regarding the difference between the $51,339.15 reinstatement amount that was given to Galyardt and the $59,646.25 reinstatement amount that was given to KYHC. If the $4,012 for two future mortgage payments were subtracted from the $59,646.25, then the total would be $55,634.25.

Next, the expert looked at the fees included in the $59,646.25 reinstatement amount given to KYHC. The fees totaled $4,324.13. However, in the $51,339.15 reinstatement amount given to Galyardt, the fees totaled $1,1921.33. The fees of $4,324.13 included (A) the $2,186.36 for the escrow shortage, which had already been divided into 36 monthly payments and included in the monthly loan amount; (B) $115 for a projected broker fee; and (C) $1,970 for a projected attorney fee. Projected fees are not permitted in the KYHC reinstatement amount because those fees have not yet been incurred.

8

If the two future mortgage payments were removed and the improper fees were removed, then the reinstatement amount would have been below $54,000. Further, if the two future months of loan payments were deducted from the $59,646.25, and Galyardt's February 2016 check for $2,000, which the Servicer rejected, had been applied, then the reinstatement amount would have been below $54,000.

On February 8, 2016, Barry Morrow, a KYHC eligibility specialist, emailed Eleanor Ojerio, a KYHC eligibility supervisor, about the Servicer's paperwork verifying the reinstatement amount for Galyardt's loan. In the email, Morrow explained that two future payments were included in the reinstatement amount, and if they were subtracted, then the reinstatement amount would be $55,633.21. Morrow asked, "Should I request the servicer to send a [reinstatement amount] with [a] good thru date [of] 2/29/2016 . . . [o]r because [the homeowner] would be over the $54k, would it just be ineligible?" Ojerio responded, "It is a NOS file."[1] Morrow then emailed Lori Rivers, a processing specialist, with the message, "This file is ineligible—PSM04—[homeowner] total past due is above the . . . limit of $54k. Please advise to the [*sic*] [homeowner]." On February 8, 2016, KYHC sent Galyardt a letter reflecting she was ineligible for assistance due to her reinstatement amount exceeding $54,000.

On February 10, 2016, Husband called the Servicer and spoke to a representative named Daniel. Husband said KYHC rejected Galyardt's application due to the

---

[1] "NOS" means notice of sale. In regard to eligibility for the KYHC program, in April 2016, KYHC had the following rule: "Loans in foreclosure may be eligible. Homeowner that is less than 21 days from a scheduled Trustee Sale will be evaluated on a case-by-case basis."

9

reinstatement amount exceeding $54,000 and asked Daniel to verify the reinstatement amount. Daniel said the reinstatement amount was $51,339.15. Husband said he would contact KYHC.

On February 11, 2016, Morrow, at KYHC, emailed Christine Tinsely, who was the KYHC liaison to the Servicer. Morrow asked Tinsely to verify the reinstatement amount of $59,646.25 because Husband told KYHC that the Servicer was holding $9,000 in loan payments. On February 22, 2016, Tinsely emailed Kaylie Malish, at the Servicer, with Morrow's question. On February 23, 2016, Malish responded and explained that Galyardt sent $7,000—not $9,000—and that the $7,000 was reflected in the $59,646.25 reinstatement amount.

On February 12, 2016, Husband called the Servicer and spoke with a representative named Magda. Magda said that on February 8, 2016, the Servicer reported a reinstatement amount of $51,339.15 to KYHC. Magda also said Galyardt's February 5th check for $2,000 was being returned to Galyardt due to the House being in foreclosure. Husband said that a representative for the Trustee told him that the foreclosure was on hold, and Husband asked Magda to confirm that the foreclosure was suspended. Magda explained that the original sale date was January 28, 2016, and it was on hold for a month, but the new sale date was February 26, 2016. Another representative of the Servicer, Myron, joined the call and said it appeared the foreclosure was on hold, but that Husband should call back later that day to confirm that information.

10

On February 16, 2016, Husband called the Servicer and spoke with a representative named Hermona. Hermona said the foreclosure sale was scheduled for February 26, 2016. Husband said the sale was on hold. Hermona informed Husband that the sale was not on hold.

On February 26, 2016, the House was sold in a foreclosure sale. Galyardt and Husband now rent the House from the new owner. At no point prior to the foreclosure did the Servicer confirm to Galyardt or Husband KYHC's statement that the reinstatement amount given to KYHC was $59,646.25. If the Servicer had confirmed that information, then Galyardt would have paid the difference between $59,646.25 and $54,000.

## DISCUSSION

A.     <u>EXCLUSION OF PRIOR LOAN MODIFICATIONS</u>

1.     *PROCEDURAL HISTORY*

Within three years of obtaining the loan for the House, Galyardt defaulted on the loan. On May 26, 2009, the Servicer offered to modify the loan, and Galyardt accepted. As part of that modification, the Servicer "wrote off $58,310.37 in principal, deferred payment of $6,909.45 in unpaid interest, and reduced [the] monthly mortgage payment to $2,183.08."

Within a year of that initial modification, Galyardt defaulted on the loan for a second time. On August 31, 2010, the Servicer offered Galyardt a second modification of the loan, and Galyardt accepted. In the second modification, the Servicer "wrote off $38,000 in principal, deferred payment of $43,732.32, and reduced [the] monthly

11

mortgage payment to $1,601.20 for the first six years, after which the mortgage payment would increase to $1,857.18."

Within three years, Galyardt defaulted on the loan for a third time. On April 16, 2013, the Servicer offered Galyardt a third loan modification, which Galyardt accepted. In the third loan modification, the Servicer "capitalized $6,652.10 in unpaid interest and escrow advances, wrote off $30,893.03 in principal and unpaid late charges, and reduced [the] monthly payment to $1,432.31."

Within six months, Galyardt defaulted on the loan for a fourth time. On September 24, 2014, the Servicer offered Galyardt a fourth loan modification, in which the loan would be permanently modified if Galyardt made three timely trial payments. Galyardt failed to make the first trial payment by the November 1, 2014, deadline, so the Servicer rescinded the modification offer. Thereafter, Galyardt applied for a loan modification through the Servicer, and the Servicer denied her application on September 2, 2015. Galyardt then applied for assistance through the KYHC program.

Galyardt moved in limine to exclude evidence of her first three loan defaults and loan modifications. Galyardt asserted evidence of her financial history would constitute improper character evidence and would be more prejudicial than probative (Evid. Code, § 352). In the character evidence argument, Galyardt asserted the Lenders wanted to introduce evidence of her prior financial difficulties "to smear [Galyardt's] character as a 'bad borrower.' "

In the Evidence Code section 352 argument, Galyardt contended evidence of her first three loan defaults and modifications lacked probative value because the

12

allegations against the Lenders were "very specific" and Galyardt's past financial issues were irrelevant as to whether the Lenders acted wrongly. Galyardt asserted the evidence was prejudicial because it was impermissible character evidence of Galyardt "being a 'bad borrower,' " which "creates a risk that the jurors might use such evidence to decide the case on an improper emotional basis and find against [Galyardt] because of a dislike for [Galyardt]."

In opposing the motion, the Lenders asserted the evidence of their prior modifications of Galyardt's loan was relevant to establishing that they were not "acting pursuant to some unlawful scheme to foreclose on [Galyardt's house] at all costs," because it demonstrated the Lenders' "extensive efforts to help [Galyardt] avoid foreclosure over the course of several years." In other words, the evidence was relevant to their defense in relation to punitive damages. In regard to prejudice, the Lenders asserted that if there were a risk of the jury misusing the evidence, then that risk could be cured by a limiting instruction.

During a hearing on the motion, the trial court asked, "The evidence will go to [Evidence Code section] 1101-type things?" Evidence Code section 1101 pertains to character evidence. Galyardt's lawyer responded, "Yeah." The trial court said, "I would agree to grant that motion in limine." The Lenders asserted that Evidence Code section 1101 was not implicated by the evidence of Galyardt's prior loan defaults and modifications. The Lenders asserted, "We're being accused of falsifying information and punitive damages are sought. We're being painted out as the villain. To have a fair

trial, the [Lenders] should be able to explain to the jury that [they are] not acting fraudulently, [they are] not acting in any malicious way toward [Galyardt]."

The trial court responded, "We're talking about specific things. We're talking about trying to renew a loan, trying to save a home, trying to get funds." Galyardt's lawyer asserted the issues in the trial were "extremely narrow": Galyardt's eligibility for KYHC; whether the Lenders failed to provide KYHC with the correct amount owed by Galyardt; whether Galyardt qualified for KYHC; and the Lenders' alleged concealment. The trial court said, "I would agree." The court granted Galyardt's motion to exclude evidence of her loan history.

During the cross-examination of Loretta Poch, who was an employee of the Servicer, the Lenders sought to introduce evidence of Galyardt's loan modifications. The Lenders asserted Galyardt's lawyer had opened the door to such evidence by asking Poch, on direct examination, about (1) foreclosure prevention options, such as loan modifications; and (2) the loan payments that Galyardt made. The Lenders asserted that any risk of the evidence being misused as character evidence could be remedied with a limiting instruction. Galyardt's lawyer asserted he did not open the door to such evidence. The trial court sustained Galyardt's objection, stating that Galyardt's lawyer "started to open it, creeped a little, but not yet."

During the Lenders case in chief, they called Husband as a witness. (Evid. Code, § 776.) The Lenders asked Husband about a recorded phone call with the Servicer that had been admitted into evidence. The Lender asked, "Do you recall the [Servicer's]

14

representative asking you if you'd be interested in pursuing a loan modification with [the Servicer]?" Husband responded, "I do not recall that."

Galyardt's lawyer asked for an offer of proof. The Lenders explained that a portion of the phone call had been played by Galyardt's lawyer during Galyardt's case in chief. The Lenders wanted to play a different portion of the phone call in which the Servicer's "representative offer[ed] a foreclosure prevention alternative . . . and . . . [Husband] say[s] he has had multiple modifications in the past." The Lenders argued, "The door has been opened by this piece of evidence being admitted into evidence last week by [Galyardt's lawyer]." Galyardt's lawyer argued that the jury had not previously heard the portion of the phone call pertaining to loan modifications, so it could properly be redacted pursuant to the trial court's ruling on the motion in limine. The trial court responded, "I agree. I'll order it be redacted." The Lenders objected to the phone call being redacted. The court responded, "It's based on my prior rulings, though."

### 2. *ANALYSIS*

The Lenders contend the trial court erred by excluding evidence of Galyardt's three prior loan defaults and modifications.

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) We apply the abuse of

discretion standard of review.  (*Uspenskaya v. Meline* (2015) 241 Cal.App.4th 996, 1000.)

We begin with the issue of probative value.  "[W]here it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."  (Civ. Code, § 3294, subd. (a).)  " 'Malice' means . . . conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  (Civ. Code, § 3294, subd. (c)(1).)  " 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."  (Civ. Code, § 3294, subd. (c)(3).)

The evidence that the Lenders modified Galyardt's loan on three prior occasions could establish that the Lenders were interested in helping Galyardt avoid foreclosure.  Thus, the evidence is probative of the Lenders not having acted with either (1) a conscious disregard of Galyardt's rights, or (2) an intention to deprive Galyardt of property.  (See *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1241 ["Punitive damages are recoverable in those fraud actions involving intentional, but not negligent, misrepresentations"].)

Next, we examine the issue of prejudice.  "[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to

16

prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) The evidence of Galyardt defaulting three times and the Lenders modifying her loan three times would not be used to prove anything about Galyardt's conduct. Rather, the evidence would be relevant to proving whether the Lenders had the requisite mental state for an award of punitive damages. Therefore, the evidence of Galyardt's three defaults would not be inadmissible character evidence because it would not be used to prove Galyardt's "conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).)

To the extent one were concerned that the evidence might provoke the jury to have an emotional bias against Galyardt because she defaulted on her loan four times, such concern could be remedied by a limiting instruction as the Lenders had suggested. (*Phillips v. Honeywell Internat. Inc.* (2017) 9 Cal.App.5th 1061, 1081.)

In sum, the evidence of Galyardt's three prior defaults and loan modifications was relevant to proving the Lenders' mental state for purposes of punitive damages, and there was little risk of prejudice. As a result, the trial court abused its discretion by excluding the evidence of the three prior defaults and modifications.

Galyardt contends the Lenders forfeited this issue by failing, in the appellants' opening brief, to adequately describe Galyardt's motion and the trial court's ruling. We find the description of the motion and ruling to be sufficient. Therefore, we conclude the issue was not forfeited.

Next, Galyardt contends, "In the trial court, [the Lenders] never explained why the fact that they agreed to earlier loan modifications was relevant." To the contrary, in their opposition to Galyardt's motions in limine, the Lenders asserted, "Specifically,

17

even though requesting that the Court award punitive damages on the basis that [the Lenders] were acting pursuant to some unlawful scheme to foreclose on [Galyardt] at all costs, [Galyardt] asked the Court, pursuant to Evidence Code section 352, to preclude [the Lenders] from rebutting such assertions by introducing evidence of [the Lenders'] extensive efforts to help [Galyardt] avoid foreclosure over the course of several years." The Lenders continued, "[S]uch evidence is relevant—and, in fact, critical—to [Galyardt's] request for damages for lost KYHC benefits and punitive damages (it rebuts [Galyardt's] allegations that [the Lenders], at all times, acted with an intent and design to foreclose on the loan)." Given that the Lenders explicitly argued that the evidence was relevant to the intent element of punitive damages, we are not persuaded that the Lenders failed to argue the issue.

Next, Galyardt asserts, "[T]he fact that [the Servicer] modified the loan is unrelated to the loan reinstatement at issue here." Galyardt's isolated focus on the causes of action means she is missing the issue of punitive damages. The evidence of prior loan modifications was relevant to the intent element of punitive damages. When evaluating the admissibility of evidence, one must consider whether the evidence is relevant to the issue of punitive damages—the analysis cannot be limited to the causes of action. (See *Hilliard v. A.H. Robins Co.* (1983) 148 Cal.App.3d 374, 400-402 [court erred by excluding evidence relevant to punitive damages]; see also *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1161 [same].)

18

Galyardt asserts the trial court excluded the evidence because it would consume an undue amount of time.[2] In the second motion for summary judgment, there was no dispute concerning the facts pertaining to the three prior loan defaults and modifications. Thus, it appears the parties could have stipulated to those facts, which means little time would have been consumed by their presentation.

Galyardt asserts an undue amount of time would have been consumed because evidence of the prior loan defaults and modifications "would open the door to an examination of each of those loan modifications and in particular why [the Lenders] agreed to them." Galyardt asserts evidence of the Lenders motive would be relevant because it could demonstrate that the Lenders modified the loan "for [their] own financial interest." Assuming such evidence exists, if the Lenders acted for selfish financial purposes in assisting Galyardt, it would still tend to prove that the Lenders were not interested in depriving Galyardt of property because the longer Galyardt stayed in the house, the more money the Lenders could selfishly collect. Thus, it does not appear such motive evidence would be relevant to Galyardt's case. Moreover, Galyardt offers no explanation as what evidence would have been used to establish the Lenders' motive (e.g., the testimony of one witness or many witnesses), which means it is unclear why such a presentation would have consumed an undue amount of time.

---

[2] After announcing its tentative ruling to grant the motion in limine, during a discussion about the motion, the trial court said to the Lenders' counsel, "I'm trying to save you some hours here."

19

We turn to whether the trial court's error was harmless. We examine whether "a different result would have been probable if such error . . . had not occurred." (Code Civ. Proc., § 475; see also Evid. Code, § 354.) The Lenders contend the error was prejudicial because the jury did not hear evidence of the Lenders' positive interactions with Galyardt, and if they had, then there is a reasonable likelihood the punitive damages award would not have been so large. We agree. The evidence that the Lenders repeatedly modified Galyardt's loan to reduce both her principal and her monthly mortgage payments was critical evidence that the jury might have used to determine that the Lenders' actions were not so reprehensible, so as to award a lesser amount of punitive damages; or that the Lenders acted negligently, rather than intentionally or recklessly, so as to deny an award of punitive damages altogether. (See *Palmer v. Ted Stevens Honda, Inc.* (1987) 193 Cal.App.3d 530, 542 [similar conclusion].)

Galyardt contends the Lenders forfeited the issue of harmless error by failing to provide a meaningful legal analysis. The Lenders discussed harmless error. However, a lengthy analysis was not required because it would have been repetitive of the Evidence Code section 352 "probative value" discussion. In other words, the reason the trial court's error is not harmless is because the probative value of the evidence was quite high in that it had the potential to prove that the Lenders did not act recklessly or with the intent to deprive Galyardt of property (Civ. Code, § 3294, subds. (c)(1) & (c)(3)). Accordingly, because it was not necessary for the Lenders to repeat a full analysis of the

20

evidence's probative value, we are not persuaded that the Lenders forfeited the issue of harmless error by not providing a lengthy discussion of the issue.

In sum, the evidence of the three prior defaults and modifications was highly probative of the element of intent within the punitive damages claim.[3] There was little prejudice in allowing the evidence because any risk of misuse could have been cured with a limiting instruction. Given the high probative value and low risk of prejudice, it was an abuse of discretion to exclude the evidence. Further, given the high probative value on the issue of intent, it is reasonably likely that the Lenders would have obtained a more favorable result had the error not occurred. Thus, the error was prejudicial. Accordingly, we will reverse the punitive damages award.

B.      SUBSTANTIAL EVIDENCE OF PUNITIVE DAMAGES

1.      *FACTS*

Galyardt's expert testified that Kaylie Malish prepared the reinstatement information that was sent from the Servicer to KYHC. Malish's title at the Servicer was "CR Workout Specialist III/Hardest Hit Fund."

---

[3] One of the elements of intentional misrepresentation is "intent to induce another's reliance on the misrepresentation." (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1255.) During oral argument in this court, the Lenders asserted that our punitive damages conclusion, i.e., that the excluded evidence was relevant to the Lenders' intent, should be extended to the intentional misrepresentation verdict. The Lenders asserted that the intentional misrepresentation verdict should be reversed, along with the non-economic damages awards, due to the trial court's error in excluding the relevant intent evidence. Because this argument was not raised in the Lenders' appellate briefs, we decline to address the merits of the contention. (*Animal Protection & Rescue League v. City of San Diego* (2015) 237 Cal.App.4th 99, 107, fn. 5 ["It is well established that we need not consider claims raised for the first time at oral argument"].)

During closing argument, Galyardt's lawyer argued, "You cannot separate a customer service rent [*sic*] from the actual intent of who is directing and calling the shots. The don has a lieutenant. He says foreclose. The lieutenant tells his capo to do little things to keep things insulated so that it protects the top from liability, and there's no difference here."

In regard to the acts that would support an award of punitive damages, Galyardt's lawyer argued, "[W]e believe that we've met our burden of proof on this, that shows with the intent to foreclose, with the hidden fees, with the blatant violations of California foreclose [*sic*] law. I mean, they violated California law so that they can foreclose on Galyardt's home."[4]

2. *ANALYSIS*

The Lenders contend the punitive damage award is not supported by substantial evidence. Specifically, the Lenders contend the record lacks evidence that a managing agent for either of the Lenders was involved in the wrongdoing.[5]

---

[4] Galyardt's lawyer argued, "[The Lenders] committed fraud and they committed negligence, and punitive damages is [*sic*] available for both." As an aside, we note that punitive damages are not recoverable for negligent acts. (*Alliance Mortgage Co. v. Rothwell*, *supra*, 10 Cal.4th at p. 1241 ["Punitive damages are recoverable in those fraud actions involving intentional, but not negligent, misrepresentations"]; *PM Group, Inc. v. Stewart* (2007) 154 Cal.App.4th 55, 69 ["[I]t is well settled that punitive damages are not recoverable for negligent misrepresentation"]; *Tri-Delta Engineering, Inc. v. Insurance Co. of North America* (1978) 80 Cal.App.3d 752, 759 ["Punitive damages are not recoverable for negligent misrepresentation"].)

[5] Although we have concluded the punitive damage award must be reversed due to the erroneous ruling excluding evidence, we address the issue of sufficiency of the evidence because, if the evidence is insufficient, then the punitive damages issue may

*[footnote continued on next page]*

"A jury may award punitive damages in a tort action 'where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice.' " (*Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 450-451.) Under the substantial evidence standard, we view "the evidence in the light most favorable to the prevailing party, giving [her] the benefit of every reasonable inference, and resolving conflicts in support of the judgment. However, since the jury's findings were subject to a heightened burden of proof, we review the record in support of these findings in light of that burden. Thus, we inquire whether the record contains ' " 'substantial evidence to support a determination by clear and convincing evidence.' " ' " (*Id.* at p. 451.)

An employer is not liable for punitive damages based upon an employee's actions, "unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." (Civ. Code, § 3294, subd. (b).)

---

not be retried. (*People v. Scott* (2000) 85 Cal.App.4th 905, 925 [It is a "well-established and unremarkable proposition that when a *civil* case is reversed on the ground of insufficiency of the evidence, the case is properly terminated; it is not remanded for a new trial"]; *Harshad & Nasir Corp. v. Global Sign Systems, Inc.* (2017) 14 Cal.App.5th 523, 542, fn. 10.)

A managing agent is "more than a mere supervisory employee. The managing agent must be someone who exercises substantial discretionary authority over decisions that ultimately determine corporate policy." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 573.) That means "a plaintiff seeking punitive damages [must] show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." (*Id.* at p. 577.)

The trial court instructed the jury accordingly: to recover punitive damages, Galyardt had to prove "1. [That [the Servicer] was an officer, director, or a managing agent of [the Bank] who was acting on behalf of [the Bank]; [or]] [¶] 2. [That an officer, a director or a managing agent of [the Bank] had advance knowledge of the unfitness of [the Servicer] and employed [him/her] with a knowing disregard of the rights or safety of others; [or]] [¶] 3. [That an officer, a director, or a managing agent of [the Bank] authorized [the Servicer's] conduct; [or]] [¶] 4. [That an officer, a director, or a managing agent of [the Bank] knew of [the Servicer's] wrongful conduct and adopted or approved the conduct after it occurred.]"

Galyardt contends the jury found that the Servicer was a director, officer, or managing agent of the Bank, i.e., option number one in the instruction.[6] There is no

---

[6] During closing argument, Galyardt's lawyer argued that the Bank had authority over the Servicer, rather than the Servicer having authority over the Bank. Specifically, he argued, "[The Servicer] never once said, you know what, 'Hey, look, we understand you want to reinstate the loan, but here we have rules we have to follow. [The Bank] is our master. We have to follow what our master orders us to do. We have been ordered not to accept your reinstatement. We have been ordered, instead, to

*[footnote continued on next page]*

evidence of the contract, if any, between the Bank and the Servicer. There is no evidence of what influence, if any, the Servicer had over the Bank's corporate policies. As a result, there is no evidence that the Servicer exercised substantial discretionary authority over decisions that ultimately determined corporate policy at the Bank. Therefore, there is no evidence that the Servicer was a managing agent of the Bank.

Next, we address the third option in the instruction—that an officer, director, or managing agent at the Bank authorized the Servicer's conduct. Someone at the Bank sent a note to the Servicer directing the Servicer to stop accepting partial payments on Galyardt's loan because only a full reinstatement payment could stop the foreclosure. There is no evidence identifying who at the Bank sent the note to the Servicer. As a result, there is no evidence that a director, officer, or managing agent of the Bank sent the note or authorized or ratified the act of sending the note.

At oral argument in this court, Galyardt asserted that the note from the Bank to stop accepting Galyardt's partial payments constituted circumstantial evidence of an officer, director, or managing agent being involved because only an officer, director, or

foreclose." Galyardt's lawyer continued, "However, their directive—the master's directive to his agent is, 'Foreclose, foreclose, foreclose.' "

Galyardt's lawyer continued, "[The Lenders], they have a relationship. Okay. They have a contractual relationship where [the Servicer] does what [the Bank] instructs them to do. Under the law, that creates an agency relationship. So when [the Servicer] is directed to foreclose at all cost [*sic*], and when [the Servicer] does that, they are vicariously liable for what their master is ordering them to do."

Now, on appeal, Galyardt asserts that the Servicer was an officer, director, or managing agent of the Bank. Specifically, Galyardt asserts the jury found "[the Servicer] was a managing agent of [the Bank]" and that the "jury also found that the conduct constituting malice, oppression, or fraud was committed by one or more officers, directors, or managing agents of [the Bank], namely [the Servicer]."

25

managing agent would send such a note because only high-ranking people at the Bank would benefit from creating that type of directive, in that the Bank profits from foreclosures.[7] When Galyardt raised the issue during oral argument, Galyardt did not direct this court to evidence indicating that (1) the Bank profited from the foreclosure of Galyardt's home, so as to support the inference that a high-ranking employee was seeking to increase the Bank's profits; (2) that partial payments were permitted under the terms of Galyardt's loan when the loan was in default, in order to support an inference that a high-ranking employee was contradicting the loan terms to foreclose at all costs; (3) if the theory is that an officer, director, or managing agent wrote the note, then evidence that people in such positions examine partial payments in individual mortgage files and draft notes in response; and (4) if the theory is that a lower-ranking employee wrote the note, then evidence of an officer, director, or managing agent creating a policy at the Bank to reject partial payments when such payments were authorized under the terms of the defaulted loan. (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 [" 'It is the duty of a party to . . . provid[e] exact page citations' "].)

---

[7] The text of the note is set forth *ante*, in the "Facts" section, but we repeat it here for ease of reference. On January 11, 2016, the Bank sent the Servicer a note that read, " '[The Bank] wants to make sure nothing will hinder a sale date from being issued in January 2016. Who can [the Bank] speak to regarding this loan to make sure that the foreclosure sale date is proceeding? It looks like [the Servicer] claims he is working with [KYHC] and [the Servicer] took the [$5,000] monies on file posted [*sic*]. These funds should not be posted, and foreclosure should proceed, unless a full reinstatement is received. If there is no full reinstatement, the money should be returned. We don't want to hold up the foreclosure process.' "

We decline to comb the thousands of pages in the record to determine if such evidence exists. (*Becerra v. McClatchy Co.* (2021) 69 Cal.App.5th 913, 953 [" 'It is not the function of this court to comb the record looking for the evidence or absence of evidence to support [a party's] argument' "].) Without such evidence one cannot reasonably infer, particularly under the clear and convincing evidence standard (Civ. Code, § 3294, subd. (a)), that an officer, director, or managing agent entered the note in Galyardt's file or authorized the note to be entered.

We now examine whether there is substantial evidence of Malish qualifying as a managing agent. There is no evidence of the Servicer's organizational structure. As a result, it is unknown where Malish, a "CR Workout Specialist III/Hardest Hit Fund," falls within the Servicer's corporate hierarchy. There is also no evidence of the job description for a "CR Workout Specialist III/Hardest Hit Fund." Therefore, it is unknown whether Malish had substantial discretionary authority over decisions determining the Servicer's corporate policy. Consequently, there is not substantial evidence that Malish was a managing agent of the Servicer. Similarly, there is no evidence that a "CR Workout Specialist III/Hardest Hit Fund" qualifies as a director or officer.

In Galyardt's lawyer's closing argument, he asserted that the intent of a customer service representative could not be separated "from the actual intent of who is directing and calling the shots." In this case, there is no evidence of who, if anyone, was "calling the shots." As a result, there is no evidence that a director, officer, or managing agent of the Servicer authorized or ratified Malish's actions.

Galyardt asserts "there was ample evidence for the jury to conclude that one or more of the [Servicer's] employees that defrauded [Galyardt] was an officer (e.g., a Senior Vice President of Default Operations, an Assistant Vice President, and a 2nd Assistant Vice President).  Based on these individuals' titles, there was sufficient evidence for the jury to conclude that at least one of these individuals was high enough in [the Servicer's] hierarchy to constitute an 'officer' under Civil Code section 3294."

Galyardt lists the names and positions of the Servicer's employees which are allegedly included in the record.  In the middle of the list, Galyardt gives the following record citation:  "Exh. 10, 29, 32, 43."  Exhibits 10 and 29 do not appear on the clerk's list of admitted exhibits, and we do not have those exhibits in our exhibit binders.  Accordingly, we conclude Galyardt is relying on exhibits that were not admitted into evidence, which means we cannot consider them in this substantial evidence analysis.

Exhibit 32 is a memorandum of understanding (MOU) between the Servicer and the CalHFA Mortgage Assistance Corporation.  The MOU records an agreement on "principles for their joint participation in developing and implementing one or more programs . . . that use monies from the Hardest Hit Fund . . . initiative."  The MOU is signed by Oscar Southall, who is the Servicer's SVP of Default Operations.  Galyardt provides no insight on how the MOU constitutes an authorization or ratification, by Southall, of the acts of Malish or the Servicer's customer service representatives, and we see no such link.

At the end of the list, Galyardt cites "Exh. 43 pp. 99, 1RT 7; Exh. 43 pp. 158-59, 164."  Reporter's transcript page number seven does not include evidence, rather, it is a

discussion about excluding witnesses and a witness list. The Lenders' attorney said, "And also, the second is Virginia Hoadley, an employee of [the Bank]. Both of these witnesses were disclosed in discovery. . . . [¶] . . . [¶] . . . Ms. Hoadley is a principal of [the Bank]." Because there is no evidence on page seven of the reporter's transcript, we do not rely on it in this substantial evidence analysis. (*In re Zeth S.* (2003) 31 Cal.4th 396, 413, fn. 11 ["It is axiomatic that the unsworn statements of counsel are not evidence"].)

Galyardt does not assert that the Lenders' attorney's statement constitutes a judicial admission. (See *Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1112 ["[S]tatements of counsel 'may be treated as judicial admissions if they were intended to be such or reasonably construed by the court or the other party as such,' such admissions must be clear and unambiguous"].) Nevertheless, to the extent such an argument could be raised, we would not rely on the statement in our substantial evidence analysis because the statement was not presented to the jury. (*People v. Reed* (2018) 4 Cal.5th 989, 1007, fn. 9 ["[W]hen considering the sufficiency of the evidence, of course, we are limited to considering the evidence actually presented to the jury"].)

Next, we address "Exhibit 43," which is part of Galyardt's citations. There is no "Exhibit 43." Rather, there are individually identified exhibits that begin with 43, for example, the clerk's exhibit list separately lists Exhibit 43-950, Exhibit 43-951, Exhibit 43-958, Exhibit 43-959, and so forth (hereinafter, Exhibit 43-950 et seq.). Thus, there is not a generic "Exhibit 43." Exhibit 43-950 et seq. consists of a partial collection of the

Servicer's notes concerning Galyardt's loan. It appears that large sections of the notes are missing, as the page numbers leap, for instance, from 951 to 958.

Galyardt refers this court to pages 99, 158, 159, and 164 of "Exhibit 43"; however, there are no such page numbers on Exhibit 43-950 et seq. Rather, at the bottom of the pages there are numbers such as 950, 951, 958, 959, and so forth. As a result, it is unclear to which particular exhibits Galyardt is referring. Galyardt contends the page numbers "correspond to the pdf. page numbers." However, we do not have a PDF version of Exhibit 43-950 et seq.; we have two exhibit binders that contain paper exhibits and a USB flash drive that contains audio recordings. Nevertheless, because this is a substantial evidence issue, we will look for substantial evidence in Exhibit 43-950 et seq.

Exhibit 43-951 includes a note from Virginia Hoadley to Jessica Hughes, in which Hoadley wrote, "morning Jessica, Would you mind looking into this for [the Bank]? My LPS is completely down and I can[']t even loo [*sic*] 10/7/15—12:12—34910 so the NOD can proceed. Thanks for your help." There is no evidence of what position Hoadley held at the Bank, so it is unclear if she was a director or officer. There is no evidence of a job description for Hoadley, so it is unclear if she had substantial discretionary authority over decisions determining corporate policy.

Within Galyardt's argument, she asserts, "Mark McCloskey, [the Servicer's] Assistant Vice President completed a 'second level review' of [Galyardt's] file on September 15, 2015. (Exh. 43 pp. 18-19.)" The Exhibit 43-950 et seq. documents that

30

we have begin with the date of October 6, 2015. Therefore, we infer that Galyardt is citing to a portion of "Exhibit 43" that was not admitted into evidence.

Next, Galyardt asserts, "Cynthia Wallace, [the Servicer's] 2nd Assistant Vice President also had her hands directly on [Galyardt's] foreclosure. [The Servicer's] internal servicing notes show her updating the system on January 29, 2016 with the following event: 'Document Approved and Executed by Cynthia Wallace. Number of 2nd Review Rejections: Additional Rejection Information (blank).' (Exh. 43 p. 146.) It is Ms. Wallace who ultimately authorized the Trustee Sale of [Galyardt's] home, as this document bears her signature. (Exh. 29.)"

The latest date in Exhibit 43-950 et seq. is January 12, 2016. Therefore, in citing to an event "on January 29, 2016" within "Exhibit 43," it appears Galyardt is once again referring to a portion of the notes that were not admitted into evidence. Further, Exhibit 29 was not admitted into evidence. Thus, we see no evidentiary support for Galyardt's assertion.

Galyardt contends that "McCloskey, Southall and other [of the Servicer's] 'policy makers' actively created and maintained policies and protocols that not only caused harm to [Galyardt], but were also patently unlawful." Galyardt supports that assertion with a citation to Exhibit 10, which is not included on the clerk's list of admitted exhibits and is not in our exhibit binders. We will nevertheless examine Exhibit 43-950 et seq. for evidentiary support of this assertion.

In reviewing Exhibit 43-950 et seq., we do not see an overall corporate policy to push foreclosures. For example, one note reads, "If California would be catching them

up the whole $56k that they are behind if they qualify?  Just trying to understand this process 01/11/16—18:28—34910 below and please advise regarding the [KYHC] question.  We don[']t want to hold up the FCL process and can you tell me 01/11/16—18:28—34910."

The foregoing note reflects an interest in learning about KYHC possibly providing the full reinstatement amount for Galyardt's loan.  Given that interest, we cannot infer there was a corporate policy, set by an unknown person or people, of moving forward with foreclosures despite other options.

Next, Galyardt points to a note by Tony Chapin, who is a "Portfolio Manager, Client Relations" for the Servicer, which reads, "Hi Jessica and Colleen, Please see Tom Welch[']s responses below.  [The Bank] wants to make sure nothing will hinder a sale date from being l 01/11/16—18:28—34910."  Galyardt does not indicate if Welch worked for the Servicer, the Bank, the Trustee, or another entity.  In regard to Chapin, Galyardt does not point to any evidence of what a Portfolio Manager, Client Relations, does for the Servicer, i.e., whether such a person has substantial discretionary authority over decisions that ultimately determined corporate policy at the Servicer.

Next, Galyardt highlights notes to and from Jessica Hughes.  Some of the notes quoted by Galyardt do not appear in Exhibit 43-950 et seq., so we infer that Galyardt is again relying on portions of "Exhibit 43" that were not admitted into evidence.  One note that Galyardt cites, which is included in Exhibit 43-950 et seq. reads, "Jessica Hughes—(Cont)—erdue [*sic*].  Can you have foreclosure address?  [The Bank] wants to make sure nothing will hinder a sale date from being issued."  It is unclear what role

32

Hughes had at the Servicer. In particular, we see no evidence that she was an officer or director or had substantial discretionary authority over decisions that ultimately determined corporate policy at the Servicer.

The next person discussed by Galyardt is Loretta Poch, who testified at trial. Poch is a High Risk Analyst for the Servicer. As a part of her job, she "deal[s] with contested foreclosure litigation." Poch has "minimal" experience with California foreclosures. Poch is primarily assigned to cases in Hawaii and Maine. She was asked by "[c]orporate legal" to handle Galyardt's case in California because the Servicer has "minimal litigation in California." Poch typically gets involved in a case after a complaint has been filed. Given that Poch does not become involved in a matter until after a lawsuit has been initiated and that she typically does not work in California, there is no indication that she was part of the wrongful conduct on which Galyardt based her lawsuit.

In sum, there is no evidence of a director, officer, or managing agent of either the Servicer or the Bank being involved in the acts at issue in the case, either by committing the acts, authorizing the acts, or ratifying the acts. Therefore, there is not substantial evidence supporting the award of punitive damages.

C.  REMAINING PUNITIVE DAMAGES ISSUES

The Lenders contend: (1) the $680,000 award of punitive damages against the Bank was improper because the evidence reflects the Bank had a negative net worth; (2) the punitive damages awards were excessive; and (3) the trial court improperly

33

bifurcated the issue of the amount of punitive damages and ordered the Lenders to provide evidence of their finances.

We have concluded *ante* that the award of punitive damages must be reversed due to the error in excluding evidence and the lack of substantial evidence. Therefore, these remaining issues pertaining to punitive damages are moot because we can provide no further relief on the issue. (*Schoshinski v. City of Los Angeles* (2017) 9 Cal.App.5th 780, 791.) As a result, we will not address the merits of these issues.

D.    JUROR MISCONDUCT

1.    *INTERACTIONS WITH GALYARDT*

a.    Procedural History

Although Galyardt was the sole borrower, Husband was the person who communicated with KYHC and the Servicer. Husband handled the communication with KYHC and the Servicer because, according to Galyardt, she is "not smart at all of this stuff right here." So, Galyardt "like[d] him to handle it all."

Husband was the first witness to testify in the case. Husband testified about his various communications and miscommunications with the Servicer and KYHC. Husband further testified about Galyardt being "devastated" by the foreclosure.

Prior to the foreclosure Galyardt was active and enjoyed going to the beach. After the foreclosure, Galyardt "crawled into a shell. . . . [She] comes home from work and goes to bed." "She wallows in depression and she cries herself to sleep." Husband explained that he and Galyardt never used to argue, but since the foreclosure, they argue. Husband said, "A couple of nights ago we fought over freakin' tacos. Who the

34

heck fights over tacos? The kids just want to move out. They don't want to be involved with us anymore. She doesn't engage with our friends. We've lost friends. She doesn't engage with them anymore. Trouble at work." Husband continued, "[O]ur love life, which was appropriate for a married couple, has diminished immensely. We don't share each other like we used to. She's getting therapy. We are getting therapy. I don't know if there's going to be a resolution to this or not. And this has been a constant battle."

In the midst of Galyardt's case in chief, during two sidebars, which occurred outside the courtroom, a juror spoke with Galyardt, and the conversations were witnessed by the courtroom deputy (the Deputy). The following day, the trial court informed the attorneys, and then had the Deputy testify.

The Deputy explained that while the judge and attorneys were in the hallway for a sidebar, Juror-13 made a comment about being tired and then said to Galyardt, " 'Hey, let me get a drink of your Starbucks.' " Galyardt responded, " 'It will cost you $5.' " The sidebar ended and the proceedings resumed.

Then, another sidebar took place in the hallway. Juror-13 made another comment to Galyardt about wanting a drink of her coffee. Galyardt "made some comments of she's not in the mood to mess around, and she began discussing some personal medical issues with the juror." The Deputy intervened and instructed them to stop conversing. The entire jury was within listening distance of the conversation; however, the jurors tended to immediately begin conversing amongst themselves during sidebars, so the Deputy was unsure if other jurors were listening to the conversation.

35

The court called Juror-13 to testify. Juror-13 said he spoke with Galyardt, but not about the case. Juror-13 said he spoke with Galyardt about her coffee, but then they were instructed to stop conversing. Juror-13 recalled speaking to Galyardt once; he did not recall Galyardt speaking about her medical conditions.

The court called Juror-14 to testify. Juror-14 said she heard Juror-13 speak to Galyardt about Galyardt's coffee, and that was the extent of their conversation. The court asked if other jurors heard the conversation, and Juror-14 said, "I think everybody was kind of part of it, heard it." Juror-14 said Galyardt did not speak about her medical conditions.

The court called Juror-12 to testify. Juror-12 heard Galyardt say "[t]hat she has psoriasis, or something, and that it's been an emotional journey." After hearing Galyardt say that, Juror-12 started speaking with the juror on the other side of her (away from Juror-13) because "it was getting a little personal," and she "didn't know what the line would be there." After that, the deputy told Juror-13 and Galyardt to stop conversing.

Loretta Poch, an employee of the Servicer, was on the witness stand during the second sidebar. The court called her to testify about what occurred in the courtroom. Poch explained that when the sidebar began, Galyardt spoke with the jurors about selling her " 'Starbucks for five bucks or ten bucks,' " "[b]ut then [Poch] heard her say, 'Don't go there,' or something like this. 'I've been depressed for four years.' And then [Galyardt] said, 'Even psoriasis came out,' or words to those effects." It did not appear

36

to Poch that Galyardt was speaking to a particular juror—"[i]t seemed like more of a group interaction."

Galyardt's lawyer asserted Juror-13 should be removed from the jury. The Lenders moved for a mistrial due to the prejudice the Lenders could suffer on the issue of Galyardt's claims for emotional distress damages. The trial court said that if Galyardt did not testify, then it would declare a mistrial. However, if Galyardt testified, then the court would instruct the jury to disregard anything they heard from her during the sidebars. The Lenders contended Galyardt should not be permitted to choose if there were a mistrial.

The Lenders asked if Juror-13 and Juror-12 would be excused. The trial court said it would admonish Galyardt. The trial court and Galyardt's lawyer told her not to speak to the jury. The Lenders requested that each juror be individually asked about their ability to remain impartial. The court individually asked Jurors 12, 13, and 14 about their abilities to remain impartial. The three jurors said they could remain impartial.

The court then asked the jury panel, as whole, whether they were "willing to disregard anything [they] may have heard outside yesterday and base [their] decision as a juror on . . . the evidence that comes from the witness stand [and] the exhibits." In unison, the jurors responded, "Yes." The court then reminded the jurors not to speak with the attorneys, witnesses, "or anybody associated with the case." The testimony in the trial resumed.

Later during the trial, Galyardt and Husband's daughter, Chelsee Galyardt (Daughter), testified that Galyardt was angry and depressed after the foreclosure. Daughter said Galyardt remains angry and depressed and that Galyardt "would get really bad anger and depression and anxiety" each time the trial was continued, which occurred six to nine times.

Galyardt testified. Galyardt said the day of the foreclosure sale "was the worst day of [her] life." She explained, "I became depressed, sick. I got psoriasis on my hands. I still have it to this day. It's an immune disease. It's from stress." Galyardt was embarrassed because neighbors saw the foreclosure notices posted on the House and they approached her saying, " 'Oh, my God, [Galyardt], what happened?' [And she] had to say [she] lost [the] house."

Galyardt said she was still not healed from the 2016 foreclosure. She explained, "I'm depressed. I'm sick to my stomach. I don't have any motivation. All I do is go to work; then I go, 'Bye, guys. I'm going to bed.' And I go to sleep. I sleep from 13 to 15 hours a day. . . . I'm so lethargic. I have nothing." Galyardt attended counseling after the foreclosure and had to increase her Prozac dosage beyond what she had been taking before the foreclosure.

One of the instructions given to the jury reads, in part, "You must decide what the facts are in this case only from the evidence you see or hear during the trial. Sworn testimony, documents, or anything else may be admitted into evidence. You may not consider as evidence anything that you see or hear when court is not in session, even something done or said by one of the parties, attorneys, or witnesses." (CACI No. 106.)

38

After the judgment was entered, the Lenders filed a motion for new trial (Code Civ. Proc., § 657), which was based, in part, on juror misconduct.  The trial court denied the motion.  On appeal, the Lenders assert that, due to the juror misconduct, "the trial court should have granted a mistrial."  We understand the foregoing assertion to mean that the Lenders' appellate argument is limited to the denial of their motion for mistrial, as opposed to the denial of their motion for new trial.  Therefore, we omit a detailed presentation of the motion for new trial.

b.      Analysis

The Lenders contend the trial court erred in denying the motion for mistrial because "[Galyardt's] interactions with the jury were inherently prejudicial."

"A trial court should grant a motion for mistrial 'only when " 'a party's chances of receiving a fair trial have been irreparably damaged' " ' [citation], that is, if it is 'apprised of prejudice that it judges incurable by admonition or instruction' [citation].  'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'  [Citation.]  Accordingly, we review a trial court's ruling on a motion for mistrial for abuse of discretion." (*People v. Avila* (2006) 38 Cal.4th 491, 573; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 985-986; see also *Petrosyan v. Prince Corp.* (2013) 223 Cal.App.4th 587, 593.)

The Lenders contend, "In the case of juror misconduct, '[w]hether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination.'  (*People v. Nesler* (1997) 16 Cal.4th 561,

582.)" Galyardt disagrees and asserts the abuse of discretion standard should be applied. The *Nesler* opinion, which concerns a ruling on a motion for new trial, cites to *In re Carpenter* (1995) 9 Cal.4th 634, 658-659 (*Carpenter*) for the standard of review. (*People v. Nesler*, *supra*, 16 Cal.4th at pp. 582-583.)

*Carpenter* began as a petition for writ of habeas corpus, filed in the trial court, after a judgment in a murder case. The petitioner asserted that a juror "had committed prejudicial misconduct during trial." The trial court held an evidentiary hearing in the matter. (*Carpenter*, *supra*, 9 Cal.4th at p. 642.) At the Supreme Court, "[t]he Attorney General [did] not challenge, and [the Supreme Court] accept[ed], the superior court's findings of historical fact, which resolved a credibility dispute." (*Id.* at p. 646.)

The Supreme Court wrote, "[D]eterminations *during trial* [of] whether a juror is biased and should be excused are entitled to deferential treatment by a reviewing court [citation], as are credibility-based factual determinations by the trial court . . . . Moreover, *posttrial* prejudice is a mixed question of law and fact ultimately determined by the 'reviewing court.' [Citations.] Because there is now a full factual record regarding the misconduct with all conflicts in the evidence resolved and with the relevant historical facts found . . . the question is for our independent determination." (*In re Carpenter*, *supra*, 9 Cal.4th at pp. 658-659.) We are reviewing the denial of the Lender's motion for mistrial, which was made during trial. We are not reviewing the post-trial ruling on the motion for new trial. Therefore, we apply the abuse of discretion standard of review.

A presumption of prejudice arises when there is an unauthorized communication with a juror and "the content of the communication was about the matter pending before the jury." (*People v. Federico* (1981) 127 Cal.App.3d 20, 38.) Presumed prejudice "can be rebutted by proof that no prejudice actually resulted." (*People v. Ryner* (1985) 164 Cal.App.3d 1075, 1082 (*Ryner*).)

We examine whether the trial court abused its discretion in determining that the evidence indicated no prejudice actually resulted. During the sidebar, Galyardt said, in front of the jury, that she suffered from psoriasis and had been on an emotional journey. When Galyardt testified, she said that she suffered from depression, bouts of anger, and psoriasis, brought about by the foreclosure. Galyardt's comments during the sidebar were a preview of her testimony. Further, nothing that Galyardt said during the sidebar was inadmissible evidence, in the sense that she said something the jury would not have otherwise heard. The timing of Galyardt's statement was wrong—it should not have been made during a sidebar. However, the content of the statement was exactly what the jury heard when Galyardt testified. Therefore, it was within the bounds of reason for the trial court to conclude that no prejudice actually resulted from the misconduct.

The Lenders assert that when Galyardt responded to Juror-13's Starbucks comment by stating that she was "not in the mood to mess around," that could have been viewed as Galyardt's emotional distress occurring "right before their eyes in the simplest of interactions." Galyardt testified about similar interactions. Galyardt said, "My boss would say, 'Why are you so upset all the time? You keep coming to work upset. You're not even your same person anymore. You're not even nice anymore.

41

You're mean to everybody.' [¶] I said, 'How would you feel if you got a house stolen from you.' [¶] And then he didn't say anything."

In the conversation with her boss, Galyardt essentially responded that she was upset due to the foreclosure. In the conversation with Juror-13, Galyardt implied that she was upset due to something, possibly the trial. Because Galyardt described a similar interaction while testifying, the trial court could reasonably conclude the misconduct was not prejudicial.

The Lenders assert that the whole conversation, including the Starbucks-focused portion of the conversation, permitted the jurors to form a rapport with Galyardt. In *Ryner*, Police Officer Boyd was a prosecution witness. During a recess, which occurred during Boyd's testimony, Boyd "engaged in a conversation in the hallway outside the courtroom with [seven] of the jurors. Neither Boyd's testimony nor any aspect of the case was discussed. Rather, topics of conversation included a recent 49er playoff game, the kind of gun Boyd carried, weapons in general, [Boyd's] experiences on the Oakland and San Jose Police forces, his Vietnam military service, and the fact that he was fatigued after working graveyard shift the night before. The discussion between Boyd and the jurors was friendly and apparently loud, as at one point the bailiff asked the group to quiet down." (*Ryner, supra*, 164 Cal.App.3d at pp. 1080-1081.)

The defendant moved for a mistrial due to juror misconduct, and the trial court held a hearing on the motion. Boyd said he "participated in the conversation to be friendly and maintain good public relations." (*Ryner, supra*, 164 Cal.App.3d at p.

42

1081.) The jurors said their ability to impartially decide the case based on the evidence had not been compromised by the conversation. (*Ibid.*)

The appellate court reasoned that "the jurors' friendly conversation with Boyd might well have caused them to accord his testimony greater credibility. Officer Boyd admitted that he participated in the discussion to foster good public relations. He may not have conversed with the jurors with the intent of ingratiating himself to them, but that could have been the result of the encounter. We add that the subjects of the conversation were such as to perhaps add to the image of Boyd as a capable and trustworthy police officer." (*Ryner*, *supra*, 164 Cal.App.3d at p. 1082.)

The appellate court concluded that the misconduct did not result in prejudice. (*Ryner*, *supra*, 164 Cal.App.3d at pp. 1083-1084.) The appellate court gave the following reasons for its conclusion. First, the conversation did not involve the case. Second, the conversation was brief. Third, Boyd was not a critical witness—his testimony was mostly cumulative, although he did testify about a statement a person made identifying the defendant as the gunman. Fourth, the misconduct was not "damaging to the defense case, which was predicated upon misidentification or lack of positive identification of [the defendant] as the assailant" because there was other evidence identifying defendant as the assailant. (*Ibid.*) The appellate court concluded, "Given the strength of the prosecution's case, the trifling nature of the misconduct and its minimal impact upon the case, we conclude that the record demonstrates no actual prejudice to [the defendant] from the indiscretions of the jurors." (*Id.* at p. 1084.)

In the instant case, the conversation involved the emotional distress issue before the jury, in that Galyardt previewed her testimony concerning her psoriasis and emotional state. The conversation in the instant case was extremely brief. The courtroom deputy estimated that Galyardt's comments about her psoriasis and emotional state lasted "[f]ive seconds at most." Galyardt was an important witness, in that she was the person named on the loan; however, her testimony presented little new information. Husband was the person who interacted with KYHC and the Servicer. Thus, it was Husband who testified about the communications and miscommunications with KYHC and the Servicer. Additionally, Husband and Daughter testified about Galyardt's emotional reaction to the foreclosure prior to Galyardt's testimony. Thus, by the time Galyardt testified about her emotional distress, her testimony was mostly cumulative.

Further, the Lenders did not contest Galyardt's claims of emotional distress. The Lenders argued, "Emotional distress damages. I don't think we can deny that [Galyardt] has been emotionally distressed in this case. But what is a major question is what caused that stress? You cannot award emotional distress damages for the pain and the hardship of litigating a case." The Lenders asserted that Galyardt failed to separate the emotional distress she suffered due to the foreclosure from the emotional distress she suffered due to the litigation, e.g., the trial continuances. The Lenders argued, "If you can't segregate out the emotional distress caused by this lawsuit and caused by the foreclosure, then you can't award those damages."

In sum, the conversation was a preview of the exact information that Galyardt testified to during the trial, Galyardt's testimony was mostly cumulative, the conversation with the juror(s) was brief, and the Lenders did not contest Galyardt's claims of emotional distress. Therefore, we are not persuaded that any good will that may have formed toward Galyardt would have resulted in prejudice.

The Lenders contend that actual prejudice was demonstrated when the jury awarded an excessive sum of emotional distress damages in comparison to the economic damages. Galyardt's lawyer argued to the jury that it should award $8,000 in economic damages and "$450,000 in emotional distress" damages. The special verdict form had one question for past emotional distress, and the jury awarded $430,000 for those damages. The special verdict form had a separate question for future emotional distress, and the jury awarded $480,000 for those damages.

It appears the jury took the suggested sum of $450,000 and used that as a rough basis for the two separate emotional distress entries. Given that the Lenders did not contest that Galyardt suffered emotional distress, it seems reasonable that the jury would take Galyardt's lawyer's suggested amount of emotional distress damages and enter that approximate sum for both emotional distress questions. We note that in reading the record, it was unclear if the suggested $450,000 sum was meant to be divided or doubled between the two emotional distress questions on the special verdict form because Galyardt's lawyer argued for $450,000 in emotional distress damages as though there were only one entry for such damages. Thus, given that the emotional distress damages appear to be in line with what was argued by Galyardt's lawyer, we

conclude the jury was not acting out of prejudice in making an allegedly excessive emotional distress damages award; rather, it appears the jury was trying to follow the argument of Galyardt's lawyer.

Next, the Lenders contend that Juror-13's failure to confess that he heard Galyardt speak about her psoriasis and emotions is evidence of perjury and actual bias. Juror-13 admitted to speaking with Galyardt about her coffee. Therefore, rather than viewing his testimony as "perjury," we see what may have been a memory lapse. It appears that Juror-13 primarily recalled his side of the conversation and failed to recall Galyardt's five second comment about her psoriasis and emotions. In other words, Juror-13 may have been more focused on himself and his comment about the coffee than on what Galyardt had to say in response. Thus, we are not persuaded that Juror-13's testimony reflects actual bias.[8]

2.   *INQUIRY*

The Lenders contend the trial court did not conduct an adequate inquiry into the juror misconduct because both parties requested the court individually question each juror, but the court only individually questioned three jurors and then questioned the entire panel as a group.

" ' "When a trial court is aware of possible juror misconduct, the court 'must "make whatever inquiry is reasonably necessary" ' to resolve the matter." [Citation.]

---

[8] Although we do not reverse on this issue, we note that the procedure of retiring from the bench to hear arguments from counsel, without admonishing the jury to not speak with the parties and witnesses, "has been criticized." (*Jackson v. Barnett* (1958) 160 Cal.App.2d 167, 171-172; see also Code Civ. Proc., § 611.)

Although courts should promptly investigate allegations of juror misconduct "to nip the problem in the bud" [citation], they have considerable discretion in determining how to conduct the investigation.' " (*People v. Virgil* (2011) 51 Cal.4th 1210, 1284.) " '[A] hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.' " (*Ibid.*) We apply the abuse of discretion standard of review. (*People v. Fayed* (2020) 9 Cal.5th 147, 174; *People v. Avila* (2006) 38 Cal.4th 491, 605.)

The trial court individually questioned five people about the incident—three jurors, the courtroom deputy, and Loretta Poch. From those five witnesses, one could form a clear understanding of what occurred during the two sidebars. Thus, it was unnecessary to question more jurors about the events of the sidebars. The trial judge asked the jury panel, as a whole, whether they were willing to remain fair and impartial, and they collectively responded yes. The trial judge asked the question and was present to see the jurors answer the question. If one of the jurors did not appear sincere or appeared to require follow-up questioning, then the trial court could have conducted individual questioning of that juror. However, we infer from the trial court accepting the jurors' collective response, that the trial court found the affirmative responses to be credible. We defer to that finding (*Ovando v. County of Los Angeles* (2008) 159 Cal.App.4th 42, 59), because we have not been presented with an argument that the credibility determination lacks substantial evidence (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 278, fn. 2). As a result, there was not good cause to doubt

the jurors' abilities to perform their duties, which means individual questioning of each juror was unnecessary.

### 3. *ELEVATOR DISCUSSION*

#### a. Procedural History

On August 6, 2019, the Lenders rested their case. Closing arguments were scheduled to start on August 7, 2019. When court commenced on August 7, the trial judge met with the parties' attorneys in chambers. The trial judge asked a conflict defense panel attorney (the conflict attorney) to explain what he "heard this morning." The following exchange took place:

The Conflict Attorney: "On the way up to 304, I was in the elevator. While I was in the elevator, three people—I'm trying real hard to remember if they all had juror badges. I know at least two did. It was clear to me, as I rode up the elevator with them, they were discussing whatever case they were on, which I assume they've been advised not to. That they discussed the—gosh, now I'm trying to remember what they were discussing. Part of it was with respect to a closing argument that was too long, or some sort of speech that was way too long, and they were somewhat upset about that, I guess I would say. And there was another matter that they discussed. I can't remember what it was, but it was about whatever trial they were on."

"The Court: You don't remember the nature of their conversation?

"[The Conflict Attorney]: You know, I don't, and I apologize.

"The Court: Did it sound like they were talking about the evidence or just—

"[The Conflict Attorney]: I didn't—I don't recall them talking about evidence.

48

"[Galyardt's Lawyer]: This is super important.

"[The Conflict Attorney]: Yeah, I know it is. But I don't recall that. I hope that you'll understand, I was also—my mind was in 304.

"The Court: Of course.

"[The Conflict Attorney]: I wasn't really thinking about what I was hearing until it dawned on me it was probably some sort of a juror misconduct."

The conflict attorney said the group conversing in the elevator included two women and one man, and he thought he would be able to recognize the man if he saw him. The trial judge suggested having the conflict attorney walk into the courtroom while the jury panel was present. Galyardt's lawyer said, "[I]t doesn't sound like it's about this case." The trial judge responded, "I don't hear anything solid about talking about evidence." The judge concluded, "We can ignore it."

The Lenders asserted that the conflict attorney should look at the jurors to "see if he recognizes any of them." Galyardt's lawyer contended, "[T]his does not rise to jury misconduct." The trial judge responded, "It's misconduct in the sense they are not doing what they're told, which is not to talk to anybody about the case or anything to do with it." The conflict attorney said he would like to look at the jurors because if he "recognize[d] them, that might help." Galyardt's lawyer asserted, "Remembering who they are is not relevant." The trial judge concluded, "I don't think it rises to the level of having to go further." The court did not admonish the jury.

b.      Analysis

The Lenders contend the jurors' conversation in the elevator, combined with the two sidebar conversations, is evidence of a pattern of juror misconduct in this case which raises "serious doubt . . . regarding the willingness of the jury to follow any of the court's instructions."

No one asked the conflict attorney, on the record, why he believed the jurors on the elevator were part of the jury in the instant case. For example, it is unclear if their juror badges identified the Department number, whether the conflict attorney followed them to the Department, or whether there was only one jury trial happening in the building. Thus, it is unknown whether the jurors on the elevator were part of the jury in this case. Nevertheless, because the trial court questioned the conflict attorney, we infer that something was said off-the-record that caused the trial court to believe the jurors on the elevator were, or may have been, part of the jury in this case.

We understand the Lenders' argument to essentially be asserting cumulative error regarding the issue of juror misconduct. "Under the 'cumulative error' doctrine, ' "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." ' " (*People v. Sorden* (2021) 65 Cal.App.5th 582, 618.)

On August 6, when the trial court excused the jury for the night, the court admonished them, "Remember now, you've heard a lot of testimony and you'll be very tempted [to] talk about it with somebody, but I urge you not to do that. I'll order you not to do it."

The conflict attorney could not recall what exactly the jurors were discussing on the morning of August 7, possibly the length of some aspect of the proceedings. However, the conflict attorney did recall that the jurors were not discussing the evidence. Thus, it appears the jurors followed the court's instruction to not discuss the evidence. Accordingly, we are not persuaded that the August 7th elevator discussion, when combined with the two sidebar discussions, demonstrates the jury was unwilling to follow instructions.

### E.      EXCLUSION OF THAILAND EVIDENCE

#### 1.      *PROCEDURAL HISTORY*

On one of Husband's telephone calls with the Servicer, he made a comment about having a poor cell phone signal because he was on a boat in Thailand. In another of Husband's telephone calls with the Servicer, due to Husband being on a boat in Thailand, he declined the Servicer's offer to participate in a three-way call with KYHC in order to sort through the issues.

The parties stipulated to the authenticity and admissibility of the telephone calls. Nevertheless, after that stipulation, Galyardt's lawyer sought to have the references to Thailand redacted from the telephone calls. Galyardt's lawyer argued that Husband was on vacation in Thailand, which is "a character issue." The trial court found the evidence was not probative and that it was prejudicial because "now it's been revealed he's in Thailand and these are the same people taking government funds." (Evid. Code, § 352.) The trial court ruled that the references to Husband being on a boat in Thailand would be redacted.

51

2. *ANALYSIS*

The Lenders contend "[t]he trial court had no such authority" to grant Galyardt relief from the stipulation.

"Either party may move the court to be relieved from the binding effect of a stipulation previously entered into, and it is within the sound discretion of the trial court whether or not such relief should be granted. [Citations.] The grounds upon which the trial court may exercise its discretion are that the stipulation was entered into as the result of fraud, misrepresentation, mistake of fact, or excusable neglect [citations], that the facts have changed, or that there is some other special circumstance rendering it unjust to enforce the stipulation." (*People v. Trujillo* (1977) 67 Cal.App.3d 547, 554-555.)

Based upon the foregoing law, we conclude the trial court had the authority to grant Galyardt relief from the stipulation. Therefore, we reject the Lenders' assertion that the trial court lacked such authority. The Lenders fail to assert that the trial court abused its discretion by granting Galyardt relief from the stipulation. For example, the Lenders do not contend that there was a lack of evidence demonstrating a mistake of fact or excusable neglect.

However, the Lenders assert the Thailand evidence was relevant. The Lenders contend that the evidence pertained to Galyardt's and Husband's "credibility and diligence," because Galyardt "swore under penalty of perjury in her KYHC application that 'My cash reserves, including all liquid assets . . . [h]ave been exhausted and I can no longer cover my basic living expenses.' [Citation.] The jury was not able to hear

about [Husband's] trip to Thailand that occurred in the same month that the foreclosure occurred."

For the sake of addressing the Lenders' concern, we will assume the trial court erred by ordering the references to Thailand be redacted. We now turn to the issue of prejudice. (Code Civ. Proc., § 475.) There was evidence in the record that Galyardt had cash available. The record reflects that she and Husband earned $7,000 to $8,000 per month; every time the reinstatement amount exceeded $54,000, Galyardt sent thousands of dollars to the Servicer; and Husband said they would have sent thousands more dollars to the Servicer if the Servicer had confirmed KYHC's statement that the reinstatement amount was $59,646.25. Thus, there was ample evidence in the record from which the Lenders could have argued that Galyardt lied when completing the KYHC application—the Thailand evidence was not critical evidence.[9] Therefore, it is not reasonably probable that a result more favorable to the Lenders would have occurred absent the assumed error of excluding the Thailand comments.

G.    NEGLIGENT MISREPRESENTATION

After the appellate briefs were filed in this case, the Lenders submitted an additional citation: *Sheen v. Wells Fargo Bank, N.A.* (2022) 12 Cal.5th 905. In that case, the Supreme Court held "that when a borrower requests a loan modification, a

_____

[9] Although the Lenders could have argued that Galyardt lied, we are not concluding that Galyardt did lie. Under the April 2016 version of the KYHC eligibility rules, a "[h]omeowner must qualify as a low-to-moderate income household." However, if, at the time of the KYHC application, the homeowner's income exceeded the income limits, then the homeowner's income was calculated "based on income during the period of hardship."

lender owes no tort duty sounding in general negligence principles to 'process, review and respond carefully and completely to' the borrower's application." (*Id.* at p. 948.)

During oral argument in this court, the Lenders asserted that the negligent misrepresentation verdict should be reversed because banks and loan servicers do not owe a duty of care to borrowers in the foreclosure prevention process. We decline to address this issue because it was not raised in the Lenders' appellate briefs. (*Animal Protection & Rescue League v. City of San Diego*, *supra*, 237 Cal.App.4th at p. 107, fn. 5 ["It is well established that we need not consider claims raised for the first time at oral argument."].)

### DISPOSITION

The punitive damages awards of $2,160,000 against Specialized Loan Servicing and $680,000 against Residential Mortgage Solution are reversed. In all other respects, the judgment is affirmed. The parties are to bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER_____
J.

We concur:

RAMIREZ_____
P. J.

CODRINGTON_____
J.

54